### STATE OF IOWA v. WILLIAM LUCAS, Appellant.

**Murder in First Degree:** EVIDENCE. In a prosecution for homicide, the evidence is considered and held sufficient to support a conviction for murder in the first degree.

**Instruction:** CIRCUMSTANTIAL EVIDENCE. In a prosecution for murder, an instruction which in effect advises the jury that each essential fact or circumstance relied upon by the state must be proven beyond a reasonable doubt, is not erroneous because omitting the word "essential."

**Same.** In a criminal prosecution, where the state is not compelled to rely on a chain of circumstantial evidence, an error in an instruction relating thereto, is not prejudicial.

**Misconduct of Jury:** NEW TRIAL. In a criminal prosecution, the fact that during the deliberations of the jury it was suggested that defendant would have the right of appeal if convicted, will not amount to misconduct authorizing a new trial, in the absence of a showing that on account of such suggestion, the jury failed to give the case due consideration.

*Appeal from Page District Court.*—HON. O. D. WHEELER, Judge.

#### THURSDAY, JANUARY 14, 1904.

THE defendant was convicted of murder in the first degree. There was a judgment imposing a life sentence, from which he appeals.—*Affirmed.*

*G. I. Miller* for appellant.

*Chas. W. Mullan*, Attorney General, and *Lawrence De Graff*, Assistant Attorney General, for the State.

SHERWIN, J.—The defendant was convicted of killing Emma Moore, a young woman with whom he had been

criminally intimate for some time before her death. Dur-
ing the fore part of May, 1902, they had
spent several days and nights together, and
had arranged to meet in Clarinda on Wednesday evening,
the 14th of the month. The defendant went to Clarinda
on the evening of the 13th, and, after making fruitless
inquiries for Miss Moore, went to a boarding house about
half past nine o'clock, and went to bed. Shortly there-
after Miss Moore went to this house, accompanied by young
Wolfkill, went to the defendant's room, and induced him
to dress and go with her. They left the boarding house
with Wolfkill, and with him went to his mother's house,
where they spent the rest of the night, occupying the
same bed in the room in which Wolfkill also slept. Early
the next morning they left the Wolfkill house. Situated
about one and one-half miles south of Clarinda, on the
right of way of the Chicago, Burlington & Quincy Railroad
Company, there was a shed which had been built by the
section men for temporary shelter. It stood east of the
track, its length being east and west, and its front or west
end was from thirteen to fifteen feet distant therefrom.
It was about eight feet wide, and at the extreme western
end less than five feet high on the inside. The roof was
of timbers, the west ends of which were placed on a cross-
beam and the east ends of which rested on the ground.
The west end was entirely open, and it was the only open-
ing in the structure. The earth was its floor, across which,
and resting thereon, some four feet from its entrance,
there was a timber six inches thick and sixteen inches
wide. To this place the defendant and Emma Moore
walked during the forenoon after leaving the Wolfkill
house, arriving there between ten and eleven o'clock.
They remained there the rest of the day and the following
night. The next morning the defendant left there early
enough to walk to Shambaugh, a station on the same line
of road, four miles south, by seven o'clock. About eight

*1. MURDER in first degree: evidence.*

o'clock the same morning the dead body of Emma Moore was discovered in the shed where she and the defendant had spent the previous day and night. The body was lying on the ground east of the cross-timber with the head resting thereon close to the north wall of the shed. It was lying very nearly, if not quite, on the back, with the feet toward the southeast. The left hand was by the side and the right was resting on the thigh. Inside of the right arm, and lying on the body, was a 32-caliber revolver, which belonged to the defendant, and which he took to the shed with him. A 32-caliber pistol ball had entered the body of the deceased midway between the nipples, and had passed slightly downward and to the left, through the heart. The facts thus far narrated are either conceded or practically undisputed.

The defendant contends that the deceased committed suicide, and that the facts and circumstances proven on the trial were not inconsistent with this theory of her death, and hence were insufficient to warrant the verdict of the jury. This feature of the case will require a somewhat detailed consideration of facts and circumstances not heretofore specifically mentioned. The criminal intimacy of the deceased and the defendant, extending over a considerable period of time and up to the day of her death, was shown beyond any question. It was also proven that the deceased thought much of the defendant, and not only wished him to marry her, but had frequently asked him to do so, both by letter and by personal solicitation. He testified that during the night they spent at the Wolfkill house she renewed this request, and that he then told her that he would not marry her, whereupon she cried, and said, "Give me that gun, and I will kill myself." He said that he then removed the cartridges from his revolver so that she could not injure herself, and handed it to her. His testimony as to her crying and as to her demand for the revolver is corroborated by the state's

witness Wolfkill, who occupied another bed in the same room where they slept. But Wolfkill also testified that some time during the night he heard the defendant swearing at the deceased, but whether this was before or after the other conversation related does not appear. Another circumstance, which should be considered in this connection, as throwing at least some light on the relations of the deceased and the defendant, and on their real feelings for each other, is the fact that some time during the night they spent at the Wolfkill house young Wolfkill asked the deceased to get into bed with him, which she did after the defendant had stated to her that she could do so if she wished. Whatever may have prompted this action on the part of the deceased and the defendant's consent thereto, and whatever may have been the real transaction between the deceased and Wolfkill at that time, it is evident that the deceased then had no serious expectation of ever becoming the wife of the defendant. Some time before then she may have entertained such a hope, for in some of her letters to him she said, in substance, that she was pregnant by him, but such claim does not appear to have been made later than the 29th of April, and it was proven that she was not pregnant at the time of her death. The defendant testified that either the night of the 14th or the morning of the 15th of May, and while they were at the shed, he told the deceased that he was going to the home of his parents in Clermont, Mo., and that she said she would remain in the shed awhile, and would then go to Clarinda, and that "probably her brother would be there, and she would ride home with him." He also testified that they both got up about half past five on the morning of the 15th, and that she again asked him to marry her, and he again refused; that she then asked him if he "would come back on the next Sunday," to which he answered that he did not think he would, and that she replied to this by saying, "Life isn't worth living to me if you won't;" that

he then started down the track for Shambaugh, leaving the deceased sitting on a pile of timber just outside of the shed.    There is no other evidence tending to show that the deceased was in an unhappy frame of mind while at this place.    There were no tears, nor was there indication of violent emotion, and, notwithstanding the fact that the deceased had asked for the revolver, and expressed a desire to end her life at the Wolfkill house after the defendant had again positively refused to marry her, she was permitted to take it, to load it, and to shoot at a mark with it at the shed during the afternoon they were there, and this without any apprehension on the part of the defendant that she would do violence to herself.    He undoubtedly knew her varying moods better than any one else, and had no fear that she would execute a threat of self-destruction.    Indeed, the threat to use the revolver seems to have been common to both, for when the deceased was in defendant's room in the boarding house on the evening of the 13th, soliciting him to go with her, he had the revolver under his pillow, and in a half playful manner told her that he would shoot her if she did not go downstairs and let him alone.

The sheriff of the county reached the shed about the middle of the forenoon on the day the body was found. Before his arrival the body had not been touched by any one, nor had any one been inside of the structure, or changed in any way the conditions therein.    He took the revolver from the body in the presence of a number of witnesses.    Immediately thereafter, and after some little effort on his part, he released the barrel catch and opened the revolver so that its cylinder was fully exposed.    He testified that he made a very careful examination of the cylinder at that precise time, and that it contained no empty shells, and but two loaded ones, and immediately upon making this discovery he held the revolver up for

the inspection of those present. His testimony as to the condition of the cylinder when he opened the revolver is corroborated by the testimony of other witnesses who were close to him at the time, and who saw him open the revolver, and noticed the number of shells the cylinder contained; and no witness testified that he saw any shell drop from the cylinder when the revolver was opened. After the sheriff had made this examination, one empty shell was found some two or three feet west of the cross-piece on which the head of the dead woman rested, and one empty shell and one loaded one were found between the body and the cross-timber. It is contended by the appellant that the shells which were found on the ground after the sheriff had opened the revolver were in fact ejected or dropped from the cylinder after it was opened. There was an ejector on the revolver, but the undisputed evidence shows that it was wet and rusty at the time, and that it did not work. It had rained during the forenoon of that day, and the testimony shows that at the time this examination was made it was not bright and light. It is probably also true that the inside of the shed was made still darker by those present. But the testimony shows without question that it was light enough within to permit the examination and measurement of foot prints in the ground therein, and this without difficulty. It is also fairly well shown that when the sheriff opened the revolver he was standing at the extreme west end of the shed opening; but, if that be not true, he was at the time with one of his knees on the cross-timber near the body, only about four feet from the open front of the shed, and in either position it would seem almost impossible to open the revolver with his eyes fixed directly upon it, and let drop therefrom one loaded and two empty shells without such fact being observed by himself or the other witnesses who were watching the revolver during the time. It is said, however, that a careful search of the ground was

made for shells before the revolver was opened, and that none were then found; but such was not the fact. It is true that the sheriff and his assistants had looked the ground over outside of the cross-timber before this, but not for the special purpose of discovering whether there were shells there. There was growing grass between the cross-timber and the shed opening, and the testimony tends to show that the empty shell found west of the timber was found in the grass. Furthermore, the loaded and unloaded shells found inside of the cross-timber were not found together, as they naturally would have been if dropped to the ground at the same time, and the position of the empty shell west of the timber two or three feet certainly showed that it was dropped or thrown there at another time.

Could the deceased have opened the revolver after shooting herself and before her death? Physicians testified upon the trial that death was probably instantaneous, and this was strongly indicated by the position of the body. It is said, "Where death is sudden, the body will usually be found lying upon the back, but, if it have not been immediate, the face and trunk will generally be turned to the ground." 3 Wharton & Stilles' Medical Jurisprudence (4th Ed.) section 302. The position of the revolver when found furnishes no presumption for or against the theory of suicide. Death having been instantaneous, and the weapon being found on the body, but not grasped in the hand, it is impossible to determine from the position alone whether it was placed there by an assassin or fell from the hands of the suicide. Wharton & Stilles, *supra*.

The defendant and the deceased were alone from the time they reached the shed on the 14th until he left there the following morning, and there is no evidence tending to show that any one else was there after he left and before the body was discovered by the section men. In fact,

the appearance of the footprints in the wet earth leading to and from the shed, and the other conditions present when the body was first discovered, all negative the idea that a third person had been there. The defendant says that when they prepared their bed for the night the deceased took off her dress skirt and one of her under skirts and spread them on the ground for them to lie on; that she occupied the north side of the bed, pretty close to the north wall of the shed; and that his overcoat was used as a cover for them both. When the body was found it was very nearly in the position just described, most of the witnesses stating that the feet were slightly to the southeast. Her dress skirt was still spread on the ground and under her body. Her jacket was lying on the timber just south of her head. Her hat was within the inclosure and some distance from the body, and her umbrella laid west of the cross-timber, and near the front of the shed. Her eyes were closed, and the expression of her face was as peaceful and composed as that of a person enjoying sweet and undisturbed sleep. There were no traces of tears or of suffering, physical or mental. Had the deceased become violently agitate1 because of her supposed loss of the defendant and killed herself in consequence thereof, as contended by him, it is hardly probable that her posture, appearance, and surroundings would have been as they were in fact. In the third volume of Wharton & Stilles' Medical Jurisprudence, section 821, it is said: "The posture, in case of a sudden and surprised death, is lying on the back; and in such case, unless natural causes of sudden death be found, the presumption is homicide. Then, again, the disposition of the limbs is significant. Sentimental suicides compose themselves gracefully for the spectacle. But when despair is the controlling cause, the countenance at least may display misery even more intense than that of a death struggle with an assassin." In cases of suicide it is not uncommon to find the eyes

closed, and it is likely that no presumption should be indulged on account thereof either for or against the theory in this case. But it was shown that the outer garment worn by the deceased where the bullet passed through it was but very slightly burned by the powder, if at all, and this was a circumstance which the jury might properly consider and give weight to in determining whether the deceased fired the fatal shot.

The morning that the body was found, a passenger train going south passed the shed at about seven o'clock. The engineer of that train testified for the defendant at the trial in October following that on that morning he saw a lady standing ten or twelve feet west of the track about eleven telegraph poles north of the shed; that his attention was attracted to her by red on her clothing or in front of her, and that she held an umbrella over and so close to her head that he did not see her face or the upper part of her body. The defendant contends that the lady so seen by the engineer was Miss Moore on her way to Clarinda. If it be true that she was alive at that time, then it is equally as true that the defendant did not kill her, for it is proven that he was at or near Shambaugh at that particular time. None of Miss Moore's clothing was red. The hat that she wore down to the shed was trimmed on the top with a couple of large bows or horns of very light red or pink material, and it is contended that she was holding her hat in her hand down in front of her body below the waist, and that it was the red on the hat which the witness saw. But the witness did not testify that he saw a hat, or that the woman was holding one in her hand. He testified that he thought she had a red dress on; that the red he saw was more extensive than the red on the hat of the deceased, and that it was of a different color. Furthermore, it was shown by the state in rebuttal that in May, a few days after the body was found, and while the grand jury was investigating the matter, one of the

grand jurors was told by the engineer Wright that the woman he saw on the morning in question was about a mile south of the shed, and that she had on a red dress and a sunbonnet. There were several public and private railway crossings between Clarinda and Shambaugh. There were many farm houses along the line of the road, and not far therefrom. The train was running about thirty miles an hour, and the engineer did not pretend that he paid particular attention to the woman, though he did testify that his attention was first called to her by the red she wore, because "red is always a danger signal." Taking into consideration all of the facts proven, many of which we have not detailed, together with the contradictory statements of the engineer, we think the jury was justified in concluding that the woman he saw was not Miss Moore. The defendant proved by a witness who lived a mile from the shed that he heard the report of a gun or revolver on the morning of the 15th of May, and that the sound came from that direction. Two other witnesses who lived at different places about the same distance from the shed also testified to hearing the report of a gun or revolver on the same morning, but none of these witnesses were able to fix the time with any degree of certainty further than to say that it was early in the morning—somewhere around six or seven o'clock. One witness said that it was as likely to have been six as seven, and that he could not tell the time within an hour; and such was the substance of the other testimony on this subject. Moreover, it was shown that the shed in question was situated near a creek, along which there was considerable shooting at that season of the year.

Our examination of the record satisfies us that the verdict is well sustained by the evidence, and that we should not interfere therewith.

The court gave the following instruction, to the latter part of which exception is taken:

"(6) If you believe from the evidence before you, beyond all reasonable doubt, that Emma Moore came to her death by reason of a shot fired from a revolver by the hand of the defendant, substantially as charged in the indictment, it matters not that such evidence is circumstantial, or made up from the facts and circumstances surrounding the death and the relations of the defendant with her, provided only that the jury believe such facts and circumstances to be proven by the evidence beyond all reasonable doubt, and to be inconsistent with any other hypothesis than the guilt of the defendant. It is not enough, however, that all the facts and circumstances shown are consistent with the guilt of the defendant, but they must be of such character that they cannot reasonably be true, in the ordinary nature of things, and the defendant innocent. The rule requiring the jury to be satisfied of the defendant's guilt beyond all reasonable doubt in order to warrant a conviction does not require, however, that you should be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish his guilt. It will be sufficient if, taking the evidence all together, you are satisfied beyond all reasonable doubt that the defendant is guilty."

The first clause of this paragraph in effect instructed the jury that each essential fact or circumstance relied upon by the state must be proven beyond a reasonable doubt. It is true the word "essential" is not used therein, but the common knowledge of jurors would apprise them that not every minor detail or fact or circumstance, unimportant in itself when standing alone, should be proven beyond a reasonable doubt. They would also understand from the language used that every fact and circumstance absolutely necessary to show that the defendant fired the fatal shot must be proven beyond a reasonable doubt.

2. INSTRUCTION: circumstantial evidence.

The criticism of the latter clause of the instruction is directed to the use of the word "link" therein. It may be conceded that it was not well chosen, although the court doubtless meant to say that it was not necessary to prove beyond a reasonable doubt every minor fact or circumstance tending to establish the facts necessary to a conviction. The jury may have critically analyzed the word, although they probably did not, and given to it a different meaning. *State v. Cohen*, 108 Iowa, 208. See, also, *State v. Hossock*, 116 Iowa, 194. We need not, however, determine whether this instruction, taken as a whole, could have been misunderstood by the jury. This is not a case wherein the state was compelled to prove a chain of circumstances. The relations existing between the defendant and the deceased were admitted by him upon the witness stand. That they were together two nights and a day immediately preceding her death was also an admitted fact. That he left her on this morning he also admitted. That the body, when found, was lying in substantially the same position she had occupied during the night, and with substantially the same clothing thereon, is undisputed. The appearance and posture of the body, the finding of the shells on the ground, the condition of the shed and other conditions present at that time are all undisputed and clearly proven. The sole and only controversy over the conditions at the shed was as to whether the shells found on the ground were there before the cylinder was exposed or whether they dropped out after the sheriff exposed it. There was no testimony sustaining the latter proposition. All it has to support it is the argument of counsel that the defendant would not have ejected the shells after shooting the deceased. There was, then, no chain of circumstances composed of different links to be proven in the state's case, and we are of the opinion that the instruction complained of could not have been prejudicial to the defendant.

<sup>3. SAME.</sup>

The appellant alleges misconduct of jurors before ver-
dict, and shows in support thereof that during its deliber-
ations on the case it was said that the defendant would
4. MISCONDUCT  have the right of appeal if convicted, and it
of jury: new
trial.          is argued that because of this knowledge of
the right of appeal the jury did not exercise the care or
give the evidence the consideration it should have re-
ceived.    Every man of sufficient understanding to be com-
petent as a juror knows that the right of appeal exists in
such cases, and hence the mere fa t that it was spoken of
in the jury room would not in itself be unusual, or out of
place.    Of course, if it were made to appear that on ac-
count of such knowledge, or because of such talk, the jury
had not given a case due consideration, but had violated
its sworn duty, and attempted to shift its responsibility,
the court would grant a new trial.    But the presumption
is that a jury has done its duty, and has acted conscien-
tiously upon the evidence before it, and not upon the
theory that, because its errors or mistakes may be cor-
rected, it will not honestly consider the case and return a
verdict based upon such consideration alone; and there is
nothing here indicating other than a full, careful, and
candid consideration of the case by the jury.

We reach the conclusion that the defendant had a fair
and impartial trial, that the jury gave the case the con-
sideration it should have received, and that the verdict
should not be disturbed.  The judgment is therefore
AFFIRMED.