STATE OF IOWA, Appellee, v. CHARLES E. REYNOLDS, Appellant.

**HOMICIDE: Evidence—Self-Defense—Character of Accused.** Not even a defendant in a charge of homicide is a competent witness to testify to the reputation of the deceased as to peaceableness or quarrelsomeness when he—the defendant—fails to show his qualification to so testify.

**WITNESSES: Impeachment—General Moral Character.** The general reputation of a witness for good moral character may be shown in rebuttal for impeaching purposes, without limiting the reputation to the time in controversy. (See Book of Anno., Vol. 1, Sec. 11271.)

**CRIMINAL LAW: New Trial—Misconduct of Jurors—Contradictory Showing—Effect.** The discretion of the court in denying a new trial in a criminal case on a conflicting showing of misconduct of the jury will not ordinarily be disturbed on appeal. (See Book of Anno., Vol. 1, Sec. 13944, Anno. 61.)

**CRIMINAL LAW: Instructions—Nonapplicability to Evidence.** A requested instruction as to the right of one accused of homicide to defend his guest is properly refused when there is no testimony upon which to base the instruction. (See Book of Anno., Vol. 1, Sec. 11491, Anno. 61 *et seq.*)

**HOMICIDE: Instructions—Inconsistent Instructions Under Inconsistent Pleas.** An accused may not plead inconsistent defenses,—i. e., (1) that he fired the fatal shot in self-defense, and (2) that the fatal shot was not fired by him, but by a third party,—and then predicate error on the claim that the court, by instructing on both pleas, placed the accused in an inconsistent light. (See Book of Anno., Vol. 1, Sec. 11493, Anno. 410 *et seq.*)

**CRIMINAL LAW: Instructions—Correct as a Whole.** Instructions are all-sufficient if they are correct as a whole.

Headnote 1: 30 C. J. p. 229 (Anno.) Headnote 2: 40 Cyc. p. 2598 (Anno.) Headnote 3: 17 C. J. p. 250. Headnote 4: 16 C. J. p. 1043. Headnote 5: 16 C. J. p. 964. Headnote 6: 16 C. J. p. 1050.

*Appeal from Fremont District Court.*—J. S. DEWELL, Judge.

DECEMBER 15, 1925.

THE defendant was indicted for murder in the first degree, convicted of manslaughter, and appeals.—*Affirmed.*

*Thomas O. Tacy* and *R. F. Hickman,* for appellant.

*Ben J. Gibson,* Attorney-general, and *Neill Garrett,* Assistant Attorney-general, for appellee.

MORLING, J.—Albert E. Webber was killed by a gunshot in defendant's home, about 3:30 or 3:45 in the morning. The only person in the house at the time besides defendant and deceased was William Tarr, who was a frequent guest of defendant's. The deceased came to the house the evening before, with a companion, Booker, uninvited. Defendant had a 38 special gun, which was the subject of exhibition and discussion that evening. All present indulged in drinking. Defendant says that, before leaving, Booker told him that, "just a little while ago," he heard Webber and two others say they were going to kill defendant. As Booker was leaving, defendant says, Webber came to them, and said, "What the h— are you s— framing up on me?" Webber refused to leave. Defendant says that they sat down, and Webber put his arm around defendant's neck, and asked defendant, "What have you been talking about me to the Callahans for?" Defendant denied talking to them, and showed deceased a bed in an adjoining room. Webber got in bed with his clothes on. Defendant lay down on his bed. The 38 special was on the window sill. Later, Stormy Jordan came to defendant's window, and awakened him. Defendant admitted him into the house. Defendant said, "Look here, Stormy, I might have shot you. Look what I had my hand laying on,"—referring to the 38 special. On being told that Webber was in the other room, Jordan, according to defendant, said: "He is a bad one. Is he drunk?" Defendant testified that Tarr said: "That is what I say. He ain't here for no good, either." Tarr denied this conversation. Defendant said: "Well, I wouldn't want to kill a man. That would be the last thing I would want to do; but I am going to protect myself." Defendant says that Tarr had told him that, while deceased had his arm round

defendant's neck, deceased was signaling to Tarr, and had a knife in his hand. Tarr denied this. Jordan left about 3:30. The 38 special was then on the kitchen table. It had been unloaded during the evening, but later, defendant had reloaded it. Defendant says that he then put it on the piano in the living room, which was between the kitchen and the bedrooms. Tarr says he did not see the gun on the piano that night. Defendant then went to the chicken coop. While there, he says, he heard a racket and cursing. He says he had in his pocket a short 38 gun. He went back through the kitchen, took the short gun, and cocked it. About that time, he heard a crash, and heard Tarr "holler 'help,' or some such thing." He saw Webber coming out of defendant's room toward Tarr. Webber had in his hand a butcher knife that belonged to defendant. He says Tarr was lying over the stool, facing the piano, and that, when he saw the knife, defendant said:

"Drop that * * * He called me a yellow livered s——, and said 'I will kill you.' * * * I was scared to death. [This statement stricken out] * * * After he said 'I will kill you,' I thought I would scare him, and I shot that gun [the short 38] off. * * * Just as soon as I shot, I made for the front door, to get out. * * * After I stepped to the door and took hold of the knob, I was holding this gun, Exhibit 9 [short 38], toward Webber. I told him to stay away from me. He came toward me, and I could not get the door open. I backed up against the door. He got up to within about two feet of the door * * * He threw the knife at me * * * I tried to pull off the gun [short gun], and it wouldn't go, * * * Just after that, another gun went off. * * * I turned in toward the shot, and saw Bill Tarr there. He had the big gun,—the one I had laid on the piano, * * * I said, 'Bill, look what you done;' and he said, 'By G——, I stopped him.'"

Deceased was killed by a bullet from the big gun. Defendant claims that Tarr fired the shot. Tarr says that, when he heard Webber getting up, he went into the middle room, and that Webber said:

"'You white livered s——, you can't slip up on me.' I said, 'What's the matter?' * * * I walked toward his bedroom door * * * to try to get him to go back to bed,—told him nobody was

going to bother him. * * * He says, 'Get out of here,' and gave me a shove * * * by putting both hands in my breast * * * I didn't see anything in his hands. He shoved me pretty hard, and I went over agin the wall * * * and didn't go down. Didn't see anything in Webber's hand, or hear any fall to the floor; didn't call for help; didn't have the big gun in his [my] hands after Jordan left; didn't see Webber throw the knife or Reynolds fumbling at the door; didn't say 'I stopped him,' and didn't shoot any gun.''

I.  The abstract shows no exceptions to the rulings complained of, except the exceptions to the instructions. However, we have examined the rulings, and find no error. By some of these rulings, evidence of previous threats of deceased against defendant, communicated and uncommunicated, were excluded. They were too remote, or cumulative, and their exclusion was nonprejudicial.  Objections to questions asked the defendant and his witnesses by defendant's counsel were properly sustained, because they called for conclusions.  Defendant was

1. HOMICIDE: evidence: self-defense: character of accused.

asked what he would say as to Webber's general reputation as to being peaceable or orderly or quarrelsome.  The defendant did not show himself qualified to testify on this point.  On the record, the rejection of this evidence could not have prejudiced defendant. As noted, the defendant was a witness in his own behalf; and

2. WITNESSES: impeachment: general moral character.

in rebuttal, witnesses for the State were allowed to testify to his general reputation for good moral character.  This was objected to, because not limited to the time in controversy.  This evidence was offered for impeaching the defendant's credibility as a witness, and was properly received.

Defendant introduced affidavits to show misconduct of the jurors in stating in the jury room what they knew about defendant.  Contradictory affidavits were also offered.  On this

3. CRIMINAL LAW: new trial: misconduct of jurors: contradictory showing: effect.

state of the record, it was within the province of the court to deny a new trial for such alleged misconduct. *State v. James*, 198 Iowa 976. The defendant asked the court to give five instructions, two of them touching the right of the defendant to defend his guest, Tarr.  By the third and fourth, the court

was asked to charge that any person unlawfully assaulted in a

**4. CRIMINAL LAW: instructions: nonapplicability to evidence.**
place where he has a right to be, etc., is not required to retreat, etc., and if, in the reasonable exercise of his right of self-defense, his assailant is killed, he is justifiable. By the fifth, the court was asked to tell the jury that they might take into consideration the presence of any other person, his participation, acts, declarations, etc. The only reference to the action of the court·upon these requests is in the motion for new trial, in which one of the grounds is stated to be that the court erred in refusing to give requested instructions one to five, inclusive. This, if it can be considered as an exception at all, is not such a one as raised any question for the consideration of the court below, or of this court. The instructions given fully covered the subject of those requested, except those relating to the right of defense of a guest. As to this, we think further that the evidence affords no basis for an instruction upon the law of defense of a guest. The only one who, on the testimony, could be claimed to have been in peril was the defendant himself.

II. This brings us to the exceptions to the instructions. The court told the jury that the defendant claimed that he did not fire the shot that killed Webber; and further, in effect, that,

**5. HOMICIDE: instructions: inconsistent instructions under inconsistent pleas.**
if he did fire the shot, Webber was, at the time, assaulting him, under circumstances justifying him in taking Webber's life in self-defense; that, if the jury found that defendant did fire the shot, then they should inquire whether or not he was justified in firing it, in self-defense. It is complained that these "instructions placed the defendant before the jury in an unfavorable light, and represented him as having made claims which he did not make;" that "this presented to the jury an inconsistent, and even a frivolous, defense, entirely different than the one made out by the defendant on the trial of the case," which was that defendant did not fire the fatal shot, but Tarr fired it; and "that, as to the part he took in repelling the assault of deceased, he claims he was justified on the ground that he was acting in defense of his home, himself, and his guest, William Tarr."

The record as set out shows beyond cavil that defendant,

in the introduction of evidence and in his own testimony as to what occurred, and by his third and fourth requests to charge, was claiming self-defense. A failure by the court to submit this defense to the jury would have been error, and assailed as such. The court could not have been expected to submit to the jury the two defenses that Tarr, and not defendant, fired the shot that killed Webber, and that defendant was acting in self-defense, in such a manner as to conceal their inconsistency. The inconsistency was in the defenses, and not in the instructions. The question of one's right to defend his home was not in the case.

III. The defendant takes up Paragraphs 10 and 11 of the instructions, and contends, with respect to them, that they state the claims of the State, and ignore those of the defendant. In

6. CRIMINAL LAW: instructions: correct as a whole.

the tenth instruction, the court informs the jury of the circumstances which will justify the taking of the life of an assailant. The eleventh discusses the same subject more in detail. It is not claimed that these instructions lay down an incorrect rule of law. In the argument it is said:

"Appellant does not claim that Instructions Nos. 10 and 11 do not correctly state the law, but does contend that, after these instructions have been given, it was error for the court not to go further, and give another instruction based on the defendant's evidence of the murderous assault made by the deceased with a butcher knife. Appellant also contends that, after these instructions were given, * * * the defendant was entitled to one presenting his version of shooting to scare the deceased."

Manifestly, the court cannot in a single paragraph fully instruct the jury upon all of the questions which the jury was to determine. There are 40 paragraphs in the instructions, covering about 23 pages of the abstract. We are of the opinion that, by the instructions, taken collectively, the defendant's rights were well guarded, and his contentions fairly laid before the jury. On the entire record, we are convinced that the defendant's case was fairly and fully presented to the jury, and all of his rights carefully guarded.

The judgment is—*Affirmed.*

FAVILLE, C. J., and EVANS and ALBERT, JJ., concur.