STATE OF IOWA, Appellee, v. B. F. KNEESKERN, Appellant.

**CRIMINAL LAW:** Motive—Non-necessity. Proof of motive is not necessary, to sustain a conviction for criminal homicide.

**CRIMINAL LAW:** Evidence—Inadmissible Experiments. Evidence as to experiments is inadmissible when performed under unstated conditions, or under conditions materially different from those attending the particular fact in issue.

**CRIMINAL LAW:** Evidence—Hearsay (?) or Res Gestae (?) Hearsay which is no part of the *res gestae* is inadmissible.

**CRIMINAL LAW:** Opinion Evidence—Allowable Conclusion. A descriptive statement of the expression upon the face of the dead may be an allowable conclusion.

**CRIMINAL LAW:** Evidence—Enlarged Photograph of Deceased. An enlarged photograph of the deceased in a prosecution for criminal homicide may be admissible.

**CRIMINAL LAW:** Evidence—Evidence at Preliminary Examination. Defendant, on cross-examination, may be examined as to his apparently voluntary testimony given on a preliminary examination in which another was accused of the crime, and not defendant. (See Book of Anno., Vol. I, Sec. 11267.)

**HOMICIDE:** Murder—Premeditation and Deliberation. Premeditation and deliberation need not exist for any particular length of time before the killing, and may be proved by circumstantial evidence.

**HOMICIDE:** Murder—Sentence and Punishment—Duty of Jury to Determine. The fact that a jury on the first trial fixed life imprisonment, instead of death, as the punishment, has no such effect on a second trial as to prevent the court from again submitting to the jury the duty to determine whether the punishment shall be death or life imprisonment.

**CRIMINAL LAW:** New Trial—Discretion of Court—Unsatisfactory Showing of Grounds. The refusal of a new trial on an unsatisfactory and uncertain showing of misconduct on the part of a juror is conclusive on appeal. (See Book of Anno., Vol. 1, Sec. 13944, Anno. 24.)

**CRIMINAL LAW:** New Trial—Inconsequential Remarks in Jury Room. No ground for new trial arises from a showing that some casual remarks were made in the jury room as to the pregnancy of the deceased and as to the accused's having thereby taken more than one life. (See Book of Anno., Vol. I, Sec. 13944, Anno. 26 *et seq.*)

**CRIMINAL LAW:** Instructions—Circumstantial Evidence. Instructions 11 to the effect that circumstantial evidence must, beyond a reasonable doubt, be consistent with guilt and, beyond such doubt, inconsistent with any other rational theory than that of guilt, are all-sufficient, in the absence of a request for more elaboration, especially when the record reveals materially more than a "chain of circumstances" against the accused. (See Book of Anno.; Vol. 1, Sec. 13897, Anno. 197 et seq.)

**CRIMINAL LAW:** Instructions—Correct But Inexplicit. Instructions 12 relative to the general purpose of impeaching testimony which are correct as far as they go are sufficient, in the absence of a request for a more particular application.

**CRIMINAL LAW:** Instructions—Summing Up as to Juror's Duty. An 13 instruction which impartially sums up the duty of the jurors both to the State and to the accused is not objectionable. (See Book of Anno., Vol. 1, Sec. 11493, Anno. 428 et seq.)

Headnote 1: 16 C. J. p. 78; 30 C. J. p. 295. Headnote 2: 16 C. J. pp. 617, 618. Headnote 3: 16 C. J. pp. 559, 577, 622. Headnote 4: 16 C. J. p. 754. Headnote 5: 16 C. J. p. 618 (Anno.) Headnote 6: 16 C. J. pp. 569, 630. Headnote 7: 29 C. J. pp. 1113, 1114; 30 C. J. pp. 293, 294. Headnote 8: 16 C. J. p. 262; 30 C. J. p. 455 (Anno.) Headnote 9: 16 C. J. p. 1243. Headnote 10: 16 C. J. p. 1172. Headnote 11: 16 C. J. pp. 1010, 1059. Headnote 12: 16 C. J. pp. 1016, 1060. Headnote 13: 16 C. J. p. 1036.

Headnote 1: 8 R. C. L. 183. Headnote 2: 8 A. L. R. 18; 10 R. C. L. 1002. Headnote 3: 10 R. C. L. 975. Headnote 4: 11 R. C. L. 568. Headnote 5: 35 L. R. A. 802; 51 L. R. A. (N. S.) 843; 10 R. C. L. 1153. Headnote 6: 8 R. C. L. 213. Headnote 7: 13 R. C. L. 766. Headnote 9: 50 L. R. A. (N. S.) 958; 20 R. C. L. 243. Headnote 10: 20 R. C. L. 259. Headnote 11: 41 L. R. A. (N. S.) 753; 8 R. C. L. 219. Headnote 12: 14 R. C. L. 796.

*Appeal from Floyd District Court.*—C. H. KELLEY, Judge.

OCTOBER 19, 1926.

REHEARING DENIED APRIL 7, 1927.

Defendant was convicted of first-degree murder, sentenced to life imprisonment, and appeals.—*Affirmed.*

*J. C. Campbell, W. M. Allen, D. D. Murphy,* and *W. S. Hart,* for appellant.

*Ben J. Gibson,* Attorney-general, *Neill Garrett,* Assistant Attorney-general, *Hurd, Lenehan, Smith & O'Connor,* and *J. A. Nelson,* County Attorney, for appellee.

MORLING, J.—I. Irene Van Brocklin and her husband, Charley, were killed by gunshot wounds in the afternoon of Sunday, December 11, 1921. The coroner's jury, composed of defendant's father, a business associate, and a farmer, impaneled on the evening of that day, accused Elmer Van Brocklin. Elmer was discharged on his preliminary examination. Informations were then filed against defendant. He was indicted for murder in the first degree for both homicides. On trial in Winneshiek County for the murder of Irene, defendant was found guilty in the first degree, and the penalty was fixed at life imprisonment. A new trial was granted, and the venue was changed to Floyd County; and the trial there had, resulted again in conviction of murder in the first degree. Defendant's main contention is that the evidence is insufficient to warrant the verdict.

As we proceed, it will become evident that the case is peculiarly one in which observation of the witnesses in giving testimony is of great importance. Two of the State's witnesses, George Moore and Elmer Van Brocklin, were impeached as of bad general moral character, and Moore as of bad reputation for truth and veracity. Defendant and his witnesses, Swenson and Rice, were impeached for bad general moral character, and Swenson and Rice for bad reputation for truth and veracity. There was sustaining evidence as to Swenson only. Many contradictory statements by defendant and by various witnesses for and against him in and out of court appear in the record.

Some important facts are admitted, or are not seriously contested. The fatal wounds were not self-inflicted, nor inflicted by either victim on the other. Each wound was from the discharge into the right breast of the victim, of the load of a 12-gauge shotgun. Not many minutes before the homicides, and in the cabin where they were committed, the defendant was indisputably alone with Irene, holding a loaded 12-gauge shotgun. Searches of the premises were made. There is no evidence of the presence or accessibility for the homicides of any other such gun or shells. While defendant and Irene were in the cabin, the husband, Charley, was on his way to or from a neighbor's

(Swenson's). No witness testified to the later presence of any other person in the cabin before the homicides. About the time they were committed, Elmer Van Brocklin was proceeding toward the cabin. Practically speaking, the question tried was whether defendant or Elmer was guilty.

A statement of the surroundings should be made. The crimes were committed in a woodchopper's cabin, occupied by Charley and Irene Van Brocklin, in the interior of a tract of 300 acres of rough cut-over land owned by defendant, by whom Charley, and, at an earlier time, Elmer also, had been employed. Irene was about 19 years old, Charley, about 22, and Elmer (Charley's brother), 26. Defendant was about 39 years old, and was a stock-buyer and farmer, living in Castalia. The cabin was about 14x24, extending northeast and southwest, consisting of a lean-to, or kitchen, on the northeast, and a living room, facing the southwest. The entrance from without was on the southwest side of the lean-to, and at the south corner. The cabin was about 15 rods west of a small creek, which extended northwardly to the Yellow River. Over the creek was a plank, crossing eastwardly from the cabin. The Yellow River was some 30 rods north of the cabin, running east and west. An east and west highway was some 20 rods north of the river. Northeast of the cabin, this highway made a short jog to the south. A path led eastwardly from the cabin over the creek to a roadway, which ran a roundabout course northerly to the river bridge, and thence northwestwardly to the highway. North of the cabin, and on the north side of the highway, were the Russett buildings. Northwestwardly from the cabin, 111 rods by air line, and north of the highway, were defendant's farm buildings, occupied by Cook, the route to which was over the roadway and highway mentioned. Northeastwardly, some 136 rods by the traveled route, were the Swenson buildings, on the east side of a north and south highway. About 104 rods southeast of the cabin, and on the west side of the highway last mentioned, were the Charles Moore buildings. There were irregular paths leading easterly and southeasterly from the cabin toward the Moore buildings. George Moore and Elmer, at the time of the murder, were living near Clermont, but on that and the preceding day, were stopping at Charles Moore's. Bobbie Schoonmaker

was a grandson of Charles Moore's, about 12 years old, living with him.

Defendant was frequently at the farm, and claims to have had, for the Sunday in question, a rabbit-hunting engagement with Charley. That morning, George, Elmer, and Bobbie went to the cabin. Irene was there alone. There had been reports that Elmer had stolen corn from Swenson. There was conversation between Elmer and Irene in the cabin about those reports. Elmer, and later Irene, went over to Cook's. Cook testified (Elmer denied) that Irene said there that Elmer had threatened to kill both Irene and Charley if they swore against him, and that she was going to Decorah to have Elmer arrested "for that you [Elmer] have been doing to me this morning." Charley and Irene went back to the cabin with a horse and cart. Elmer followed. Elmer asked Charley, "Who is keeping this corn proposition whooping up around the country?" He (Charley) said, "Frank Kneeskern [defendant] and Harry Swenson." Elmer and Bobbie went to Charles Moore's and had their dinner. George lingered at the cabin after Elmer and Bobbie had gone. Cook, and later defendant (he says, about 1:15), came to the cabin. Irene, Charley, and George were then there. Defendant brought some groceries that Irene had the day before asked him to bring. Defendant had his 12-gauge shotgun, loaded, and a belt containing loaded shells. The horse which Charley had brought over from Cook's had been given to him by defendant. Charley told of an offer that Swenson had made for it, and defendant advised Charley to sell. Charley started to Swenson's with the horse. Defendant told Charley to hurry back, as he says, "because I came hunting down here. Said he would be back in a minute." About that time, defendant fired the gun at an old coffee pot. He went back into the cabin where Irene and Moore were, taking the gun, which had loaded shells in the magazine. Cook left. Bobbie returned to the cabin, and asked George to go to his dinner at Charles Moore's. Elmer was then at Charles Moore's. George testified that defendant then asked him "to tell Elmer that he was up there, and if he wanted to see him, to come up." George and Bobbie went back to the Moore house. They say that, when they left, Irene asked them to stay until Charley got back.

At this point we will take up Elmer's movements, with ref-

erence to the charge that he is guilty. When George got to the
Moore home, according to the testimony of both George and
Elmer, George told Elmer that defendant was at the cabin and
wanted to see him. Elmer started for the cabin. How long it
was after George returned, and the length of time that Elmer
was gone, are important questions, upon which the evidence is
conflicting. Defendant relies on the testimony of Swenson as
controlling, both upon the question of whether Elmer committed
the crimes and whether Charley could have got back into the
cabin and been shot without being seen by Elmer. Swenson,
who was in his own yard, some 70 rods north of and in full
sight of the Moore buildings, says that Charley came running
with the horse, delivered it, and started back running toward
the cabin; that, when Charley on his way back was about 22 or
23 rods west from Swenson's, he (Swenson) saw Elmer about
15 rods west of the Moore house, proceeding toward the cabin;
that Charley would be in full sight of Elmer practically all the
way, on the routes they were taking; that, about three quarters
of an hour after he thus saw Elmer, Elmer and George came
from the direction of Moore's, and asked if he had seen Charley.
Swenson testified that, before seeing Elmer, as just referred to,
he saw George Moore enter the Charles Moore house, and on the
last trial testified that Elmer immediately afterward left the
Moore house, proceeding westwardly toward the cabin. Whether
Swenson saw Charley and Elmer at the same time, and the
length of the time elapsing between the return of George and
the starting by Elmer, and what time Elmer started, and the
time of his return, are important questions. One witness says
that Swenson told him that he did not see Elmer go toward the
cabin. Another witness says that Swenson told him that, in
about 15 minutes after Charley started back, he saw Elmer go
toward the cabin, and in less than 10 minutes, Elmer came back;
that Swenson said, ''I don't see how Elmer could have done it.''
A physician calling at Swenson's says that Swenson told him
that he did not know how long it was after Charley left that he
saw Elmer; that Swenson said that he afterward timed 10 min-
utes, and that it seemed a long time, but that he didn't know how
long it was between the time Charley started and when he saw
Elmer. An attorney testified that he asked Swenson how long
it was after he noticed Charley on the way back to the cabin

that he noticed Elmer leaving the Moore place; that Swenson hesitated, and then said, "A short time." Witness asked if it was 10 minutes or less, and Swenson answered, "More." On previous examination, Swenson testified that it was a few minutes after George went in the house that he saw Elmer. George and Bobbie say that they saw Charley going toward Swenson's with a horse when they were near the Charles Moore buildings, and George says that Elmer started right away after he got into the house. Elmer says he started 10 or 15 minutes afterwards, and Bobbie says, 5 or 10 minutes. George, Bobbie, and Elmer say that Elmer was gone only 10 or 15 minutes from the Moore house. The only evidence on the subject whether Elmer was told that defendant was at the cabin is that he was so told. There is no evidence that Elmer had any gun of any kind, or had access to any gun, except that there were guns in the cabin, of an entirely different character. It is certain that they were not used in the murder. Swenson, after considerable equivocation, testified:

"Q. Did you see anything in the hands of Elmer as he walked west? A. I don't know if he had anything or not, for sure. * * * I couldn't see anything. * * * I won't say, Mr. O'Connor, that he did not have anything in his hands. * * * Saw a white piece of paper flip up into the air. Supposed it was a cigarette paper."

If he could see a cigarette paper, he could see a gun, if Elmer had one.

According to measured distances, based upon Swenson's testimony, Charley had 114 rods, and Elmer 89 rods, to go by the paths, to reach the cabin from the points where Swenson claims to have seen them. Elmer, to have committed the murders, would, on Swenson's testimony, have had to travel, in going and returning to the Moore house, nearly 200 rods, and to have found a gun of the same gauge as that which defendant had. If the gun was not loaded, he would have had to find the proper shells and loaded it, killed two people, covered the bodies, and disposed of the gun in such a way that, though searches that evening and since have been made, no trace of it has ever been found. On returning to Moore's, he must have had some conversation with George Moore. Both of them then traveled 70 or 72 rods to Swenson's. All this must have occurred, according to Swenson's

testimony, and on defendant's theory, in about three quarters of an hour; on the evidence of the State's witnesses, within much less time. That Elmer should go to the cabin at that time and under those circumstances, to commit one or both of the murders, and should have succeeded so adroitly, the jury might say was incredible.

Elmer testified that he did not see Charley on the way to the cabin. Swenson testified that Bobbie ran after Elmer, as Elmer was going west, and pointed north toward Charley, who was then on his way west. Bobbie says he was pointing north, but not at Charley, and denies having told Swenson, as Swenson testified, that he was pointing at Charley, and denies that he saw Charley going home from Swenson's.

Elmer testified that, as he approached the cabin, he saw the defendant in the door, stooping over, "his rump sticking out of the door;" that defendant straightened up a couple of times, and looked toward Elmer, then went inside; that he came out carrying a shotgun; that he was about 4 rods away. Elmer says that he asked defendant to come down by the little bridge; that defendant said, "No; tell me what you got to tell right there. I have good ears."

"* * * When I got to the little bridge, he told me not to come any farther. 'You are taking awful steps. Don't come any farther.' * * * He was bringing the gun around. * * * I stopped right there, and said: 'Frank, you have told everybody in the country that you don't want me on the place. * * * If you don't want me here, tell me. There is nothing here I want.' And I then said, 'You hold a grudge against me of an overdraw of some money;' and I said, 'Charley overdrawed it, and I took the blame for it. * * * I will pay you.' * * * He said, 'I told them to pack their grips and go home, and forget this matter.' * * * He turned around and started right back there to the cabin. * * * Next thing I did, after going back to Moore's house, was to go into the house, and then George Moore and I walked to Swenson's, 70 or 72 rods, and stayed maybe 10 minutes. * * * Saw nothing of Charley, either going to cabin or returning."

Elmer testified that he followed a path on the way back to the cabin. Defendant offered evidence that the paths were farther north than the cabin, and that from the paths the de-

fendant could not be seen in the position in which Elmer claims
to have seen him, on account of the intervening south corner of
the cabin. Elmer, in the presence of witnesses, located himself
on the ground where he says he was when he saw defendant.
The evidence is that there was no path there, but that from that
point, and for 12 paces farther north, the defendant could be
seen, as Elmer testifies. It was within the province of the jury
to find that Elmer was mistaken in saying that he was in a
path when he saw defendant, and it was within their province to
say that he did not see Charley on the way to the cabin, and
that Charley arrived at the cabin and received the fatal wound
before Elmer reached the place where, as he says, he saw the
defendant stooping over in the door. The case is one of circum-
stantial evidence. It is not doubted that guilt is with Elmer or
with defendant. Elmer's testimony, as indicated, was for the
jury. Defendant had the opportunity, and, unless the shot
found in the bodies were number six and the defendant's shells
were not loaded with that size shot (further reference to which,
as well as to motive, will be made later), had the means of com-
mitting the homicides. Bobbie testified that, when defendant
told Charley to hurry back, so that he could go hunting, Charley
said that he had only one shell; and that something was said to
the effect that Charley and Irene could play dog, as long as
they had no ammunition. Defendant's version of his move-
ments after Charley started for Swenson's is that he told George
to have his father settle up the corn deal with Swenson. In
previous testimony, defendant said that George, Bobbie, and he
himself were in the cabin 5 or 10 minutes after Charley left
and before George and Bobbie left. Defendant testifies that,
after Bobbie and George started for Moore's, he said to Irene,
"If you are going hunting, you want to hurry up and get ready,
because Charley will be back in a minute;" that he never saw
Charley alive after Charley left with the horse. He denies that
he killed either Charley or Irene. He also says:

"When Charley left cabin with horse, I went out east of
cabin and north and west down around cabin * * * There were
brush piles there. Then I went up over the hill south, to near
where there was a sawmill; and, as I was walking toward the
sawmill, about 8 or 10 rods west of it, I looked down in direction
of cabin and saw someone * * * approaching from side of foot

bridge towards Moore's. Paid no particular attention, and did not recognize person positively. Thought it was Charley, coming back; and I went down around sawmill and back through some brush piles. Nobody came, so I went down toward cabin. When I got within 4 or 5 rods of cabin, I heard quarreling, and stopped, and heard someone say, 'I will shoot you, you son of a bitch,' or 'son of bitches;' and I turned around and walked away. I was then within 4 or 5 rods west and perhaps a little south of cabin, and turned and went west. When I was going over hill, perhaps 18 or 20 rods from cabin, I heard faint sound, like you would slam a door, or throw somebody again the floor of the building,—kind of a 'pung' sound. I went on to auto.''

The auto was at the jog in the road northeast of the cabin. On Elmer's preliminary, defendant testified:

''Then George and the little kid goes home, and I walks down north of the house, around by the little cabin and little brush piles. Charley must have been up near Swenson by that time; and I walks around north, up on top of the hill where some brush piles. I had been up there a few minutes,—not long, —and I saw someone coming down below, where the other cabin was. Well, I supposed it was Charley, because he was to hurry back. I walks around two or three brush piles down towards the house. * * * Well, I walks around a few brush piles, and then walks down toward Charley's house. Now I call that Charley's house, because that is where he made his home.''

Defendant's testimony as to his movements and his directions and his observations of the supposed Charley are not consistent. Defendant's attention was called to his differing testimony on the Elmer Van Brocklin hearing, as to his course after he left the cabin. He said that he misspoke himself. He said he didn't see any rabbits. Had no idea who the man approaching was.

''Q. You thought it was Charley? A. I wasn't looking for anybody else. Was waiting for Charley to go hunting with me, and told him to hurry back from Swenson. Q. So you started back to get him, didn't you,—to the cabin? A. I started to go home, when I left. * * * Q. Did you change your mind about hunting with Charley then? A. It was getting a little late. * * * Yes, sir, I had, at that time. Q. When did you change it? A. When I started to go away. Q. Well, had you changed your

mind about going hunting with Charley when you started back from the point down near the sawmill towards the cabin? Had you still in mind at that time to go hunting with Charley? A. No, I figured on going home then.''

Defendant, on his statements, was inferentially looking for and expecting Charley and expecting to go hunting with him, right up to the moment when Charley had apparently appeared, and defendant's expectation was fulfilled. Then he suddenly changed his mind. If he was where he says he was, under those circumstances, and Elmer was approaching during that time, it is likely that defendant would have seen and recognized both of them, and if Elmer had a gun, would have seen it. Defendant says that he had been told of Elmer's threat that morning to kill Charley and Irene. If so, it could not have been much more than an hour before the disturbance in the cabin which he says he thought ''was a family row, and I didn't want to mix in it. * * * Don't know as we thought who had committed the murders. Had not occurred to me who might have done it.'' He says he did not recognize the voices. Russett testified that, when Cook and defendant came to his house, defendant said, '' 'Something awful has happened over here;' and I said, 'What was that?' and he said, 'There are two dead ones over here;' and I says, 'Who are they?' and he says, 'Charley and Irene Van Brocklin;' and I says, 'Who has done that?' and he says he didn't know.'' Russett says that both Cook and defendant said they didn't know. Cook testified that he and defendant had no talk about who did it.

The evidence is that there were no powder marks on the bodies, so that the report of the gun was not necessarily muffled. The jury might say that it was not altogether reasonable that, under the circumstances related by defendant, he would have heard but one sound, and that a faint one, ''like you would slam a door, or throw somebody again the floor,'' or that he would not have thought about or suspected who committed the murders.

He says that he fired two shells, the one at the coffee pot mentioned, and one into a shock of corn, after he got to his automobile. Waters, a member of the coroner's jury, says that defendant, at Elmer's preliminary, told him that he unloaded shells from the magazine and shot off the shell in the gun when he got

into the car. Defendant went to Cook's, and Cook and he went to the cabin. Defendant says:

"When we were within about a rod of the cabin, I says to Cook, 'Listen!' but he didn't slack up at all * * * I followed him right up to the door, he opened it, and we both walked in. Charley laid to the west of the door * * * Cook raised up his hat. You could tell by his expression that Charley was gone. I says, 'Bill, he is gone.' (Statement stricken out.) Cook raised up the hat and dropped it. I stepped over and took the hat and put it back on his face. Cook pulled up blanket or quilt, and raised up right hand that was laying across his chest, all covered with blood, and he dropped it. We tucked blanket or quilt around him. One leg was crooked up about half way, and I took hold of shoe and straightened it. We went to other door, that was about half ajar. Irene was lying with head near foot of bed, and feet towards heating stove in corner, and I says, 'Bill, she's fainted.' (Statement stricken out.) Cook went over and took her by shoulder, and I walked over and leant down and saw pool of blood running away from her. Cook had sweater in hand, and put it back over her, and turned to go out. * * * Walked over to Russett's. * * * Saw boy in yard, and hollowed to him to tell his father to come out * * * and Russett came down to fence. We were all talking, and who said anything would be pretty hard to tell. We talked over that we should put a guard around the house until officers came, and telephone to sheriff."

Russett's phone was not working well, so they went back to Cook's. Telephoned from there. Sheriff arrived at 5 o'clock.

Defendant went to Castalia. His father was living at Ossian. He telephoned to Ossian, as he says, to the man that he thought was the coroner. His father, another man from Ossian, a brother, a brother-in-law, Schuette, a business associate, went to the inquest at Russett's house that evening. As noted, the father and the business associate were two of the coroner's jury. The shot found in the bodies were apparently number six size, though the difference between number six and the next sizes is not very perceptible. There is a little weak evidence that the punctures made in the coffee pot were with number six size. Schuette (a witness for defendant) was occupying a part of the building in which defendant had his office, and to which he went, and from which he telephoned on reaching Castalia. Schuette

testified that defendant said that he was going out to the farm, and didn't like to go alone; that he had been threatened. (There is no evidence that at that time he had been threatened.) Schuette said he would go with him, but didn't have any shells. Defendant said he would get him some shells. Defendant had with him there his belt, practically filled with loaded 12-gauge shells, and, as he claims, like shells in the magazine of his gun. Defendant went to the hardware store, and selected two boxes of the same gauge as those in his belt. The young girl who admitted defendant to the store testified that defendant took a shell or some object out of his pocket, and comparing, said, "This will be all right." Defendant gave the two boxes purchased, one Size 5 and one Size 7½, the same size he claims to have had in his belt, to Schuette. They took the gun and the belt to defendant's house. Schuette admits removing loaded shells from the gun. A next-door neighbor, Mrs. Riggs, gave testimony tending to show that Schuette that evening went from defendant's home with a shotgun, toward a railroad culvert, there unloaded the gun, came back with it, and set it up in a corner of defendant's dining room. Schuette, on that and the next evening, took possession of a number of weapons and of the shells which the defendant and his wife had in their house. Schuette says he turned them over to the sheriff. Schuette did not testify until the last trial that he did not take the gun to the culvert. They went to the inquest, but Schuette did not take a 12-gauge gun or shells. He took a revolver. The next evening, friends and associates of defendant's searched at the cabin for finger marks, the coffee pot, and shot and wad. They claim to have found two shot and to have given them to Grimstad, who was the marshal at Castalia, and afterwards became a witness for the State. Two shot were found. Defendant later handed Grimstad two shot, saying, according to Grimstad, "Now mind you, you got those from John Schuette, and not from me." Grimstad lost them. There was much controversy whether the gun wad claimed to have been found had ever been shot through a gun. The shells given to the sheriff were not number six. A bloody door knob and a bloody piece of wall board were also taken by the searching party to Castalia. There is no evidence regarding the identity of the finger prints upon them.

It is argued that defendant had only commercially loaded

shells, and that such shells contained two felt wads; whereas, in the bodies, according to the physician's testimony, in each case only one wad was discovered. There is no evidence that there were any home-loaded shells in Elmer's possession, or accessible to him. Search of the premises was made Sunday and Monday, and no 12-gauge gun or ammunition was discovered. There is evidence that felt wads in coming through a gun are sometimes torn to pieces. The felt wads made the compression or combustion chamber and the cushion for the shot expelled from the gun. The wadding found was in the broken bony tissue of Irene's body attached to the backbone, and in Charley's, it was in the lacerated lung tissue. Defendant's gun expert testified that in the receptacle containing the matter taken from Irene's body was "one fiber wad, with one paper surface missing, and the other hanging onto the wad,—such a wad as is usually found between powder and shot,—and the other is a cardboard wad, found directly over the powder;" that in that taken from Charley's body there "seems to be a top shot wad and a fiber wad and a part of a wad,—cannot determine what it was originally. It seems to be saturated with blood and stiffened. It must be part of a black edge wad." The fiber wads are between the powder and shot.

We think it clear that, upon this evidence, we would not be justified in holding that there were not two felt wads in the shells, or that the shells were not commercially loaded.

We may here say parenthetically that defendant offered evidence that, in the summer or early fall of 1921, Charley had hand-loading tools and loaded shells for use in a double-barreled shotgun; that they had one cardboard wad and one hair wad on the powder. There was no offer to show their size, or that any of them were in the cabin or accessible or known to Elmer. The witness testified that Charley had a double-barreled shotgun; that she did not know anything about the size; that that fall it was wrapped in a blanket and put under the bedtick. The evidence is that the bed, at the time of the crime, was undisturbed; also, that it was searched for a gun. We may say here that the court committed no error in his rulings rejecting the offer of testimony referred to.

Some of the witnesses testified to suggestions made by defendant as to how they should testify. Under the circumstances

related, and without further details, we are of the opinion that the jury might find that the size of shot found in the bodies was not different from that of the shot in defendant's shells.

The evidence of motive is weak. The charge in this respect is one not easily proved. It is the "crime of darkness." Fischer, who at the time was an employee of defendant's, testified that, before the tragedy, defendant had told him that he had some trouble to settle at the cabin. He gave testimony to the effect that he tried to induce defendant not to go to the cabin, and that the defendant said that it wouldn't make any difference whether he came home alive.

<small>1. CRIMINAL LAW: motive: non-necessity.</small>

"In the first conversation you had, that Sunday morning that I inquired about, was there anything said about paying Charley and Irene any money? If so, state what it was. A. Yes. * * * He said, 'Bill, I had so many troubles, I will get out of this one.' I said: 'I doubt it, Frank; I don't believe it; you better pay them a little, perhaps, and stay away there.' "

Fischer says that defendant "said that Bill Cook told him that I swore on the witness stand on Decorah that he had a little with that woman, and after that he shot her, and I said, 'You know what you done with that little woman before you shot her * * * ' "

He doesn't say whether defendant made any reply. *State v. Cruse*, 112 Kan. 486 (212 Pac. 81).

Fischer's testimony was contradictory. He evidently, as he said, had trouble in expressing himself, and apparently had had something of a fainting spell on the stand. Teepe testified that defendant came to see him about some trouble that he and Schuette had, and Teepe said to defendant that he "had been caught with Irene in weeds, and he said, 'Yes, and if I caught you in weeds with girl or woman, I would go and mind my own business, and not squeal on you.' " Defendant's version was that he understood that Teepe was going to "lay for him," and something was said about trouble between Teepe and another party; that defendant told Teepe that, as long as the other party was keeping quiet, he ought to be man enough to keep his mouth shut.

Proof of motive is not necessary. *State v. Quan Sue*, 191

Iowa 144; *State v. Meyer*, 180 Iowa 210. There is evidence on the subject for the consideration of the jury.

Elmer's movements after turning back from the cabin consisted in returning to the Moore house, going to Swenson's, returning to Moore's, and then, with George, going to Decorah to sell some furs. They got back to Moore's about 6:30, and, according to the State's witnesses, then learned of the homicides. Elmer was not interrogated as to whether or when he related the occurrences with defendant referred to.

As previously noted, the imponderables—the appearance, demeanor, and manner of the witnesses in testifying—were unusually important. Even the printed page, however, reflects them to an unusual degree. Elmer is a roustabout, without means, character, or influentially helpful friends. Suspicion was naturally directed against him. The record indicates nothing to excite sympathy in his behalf. But his testimony seems to have been simple and direct. The magistrate promptly discharged him, and two juries in different counties, before whom he was, practically speaking, tried, have acquitted him. Defendant seems to have had means and standing. Influential friends went immediately to his assistance. His testimony, however, creates the impression of shiftiness and craft. Seven witnesses residing in Castalia, Ossian, and vicinity impeached him as a witness, by testifying that his general reputation as to moral character is bad. They were not contradicted or seriously cross-examined. Witnesses testified that his character in respect to his being orderly, quiet, kindly, and well disposed towards others is good. They were not contradicted. But such evidence does not meet all the traits involved. The testimony of Swenson, upon which defendant mainly relies, is, as has been noted, equivocal, and contradicted by testimony of previous conflicting statements.

The unusual character of the case and the suspicion naturally directed against Elmer have commanded many days' critical examination and re-examination of the 740 pages of printed evidence and many exhibits, by both divisions of the court. We are of the opinion that the evidence sustains the verdict.

II. Claim is made that the defendant was barred by the court from giving evidence as to conversations testified to by the State's witnesses. The record does not sustain this contention.

Furthermore, the court expressly announced that he had not intended to exclude any evidence of any such conversation. He gave defendant's counsel time to consider the subject and call attention to any such exclusion, with the privilege of having it corrected. No such matter was again called to the attention of the court.

III. Defendant claims that certain experimental evidence was not admitted. A coffee pot into which experimental shots had been fired, similar to that offered by the State, was received. A

2. CRIMINAL LAW: tin can of larger size, softer metal, punctured
evidence: inad- in a much different manner, under conditions not
missible experi-
ments.          shown, was not admitted in evidence. Two tin plates into which experimental shots were fired were likewise rejected. We are of the opinion that they were not admissible. If admitted, they would have been of no possible assistance to the jury.

IV. Defendant complains of numerous rulings upon defendant's opening statement and offers of evidence of occurrences antedating the crime, including conversations between the

3. CRIMINAL LAW: victims and third parties and rulings upon ques-
evidence: hear- tions propounded to Elmer on cross-examination,
say (?) or res
gestae (?)       for the ostensible purpose of proving that Elmer had come from Clermont because of the accusation and threatened prosecution for stealing Swenson's corn, and proving that he was inferentially guilty of the murder. These offers comprise talks in the cabin and at Swenson's, trouble between Elmer, Charley, and Irene, Charley's possession of a 12-gauge shotgun (prior to the tragedy and elsewhere than on the place) and of reloading tools, statements by Charley and Irene and the Moores, quarrels between Irene and Elmer, and a telephone call the morning before the tragedy from Charles Moore to George, calling George to bring Elmer there. None of these matters were any part of the res gestae. They were hearsay, and have no tendency to show the innocence of the defendant. Those offered as cross-examination were not proper cross-examination. At most, some of the alleged facts, if competent evidence of them was offered, would tend merely to raise a suspicion against Elmer, and this was otherwise shown. Some of the offers were of statements made by Charley and Irene, indicating their feelings to-

ward Elmer. The court told defendant's counsel, with reference to the corn stealing:

"I let you go into that latter [matter] absolutely as far as you pleased,—at least, I intended to;" and "would permit you to show anything that was said by Elmer indicating his feeling toward them [Charley and Irene], or connecting him with anything directly that is said by others, or in other words, said in his presence." Also: "If you want to show that Elmer Van Brocklin had a gun and he was offering it for sale, I would agree that that would be receivable."

The court committed no error of which defendant can complain, in his rulings upon this class of evidence. *State v. Sale,* 119 Iowa 1; *State v. Beeson,* 155 Iowa 355; *State v. Calabrese,* 99 N. J. Law 312 (124 Atl. 54) ; *State v. Banoch,* 193 Iowa 851; *Irvin v. State,* 11 Okla. Cr. 301 (146 Pac. 453), and cases cited; *Terry v. State,* 13 Ala. App. 115 (69 So. 370) ; 8 Ruling Case Law 185, Section 178; 16 Corpus Juris 559; *Johnson v. State,* 91 Tex. Cr. 291 (238 S. W. 933) ; *People v. Vatek,* 71 Cal. App. 453 (236 Pac. 163) ; *State v. Caviness,* 40 Ida. 500 (235 Pac. 890).

V. The coroner was asked to describe the appearance of the bodies, and stated that Charley's face was set, with stern, glaring eyes, and a ghastly, determined look. Defendant moved to strike this out, as a conclusion. The statement was a conclusion, but a permissible one. *Rothrock v. City of Cedar Rapids,* 128 Iowa 252; *State v. Japone,* 202 Iowa 450. Its admission was without prejudice.

4. CRIMINAL LAW: opinion evidence: allowable conclusion.

VI. An enlarged photograph of Irene was admitted, over defendant's objection. Complaint is made that the only purpose of offering it was to appeal to the emotions and prejudices of the jury. The doctor testified that Irene was a fine-featured, nice-looking lady. The photograph shows no more. As stated in *Walsh v. People,* 88 N. Y. 458, the photograph served no purpose except to acquaint the jurors with the features and appearance of the deceased, and if the jurors had known her in her lifetime, they would not for that reason have been disqualified. The opinion also says that the court might doubtless interfere, in the interest of justice, to restrain undue license on the

5. CRIMINAL LAW: evidence: enlarged photograph of deceased.

part of counsel in addressing the jury; and that, if the prose-
cuting attorney, instead of exhibiting the picture, had described
the deceased in terms calculated to excite the sympathy or pity
of the jury, it would scarcely be claimed that an exception would
lie. The photograph apprised the jury of no material fact. The
court must necessarily have some discretion and latitude in ad-
mitting and rejecting evidence. *State v. Mulhollen*, 173 Iowa
242; *Lehman v. Minneapolis & St. L. R. Co.*, 153 Iowa 118; cases
cited in 17 Corpus Juris 240. We are required to "examine the
record without regard to technical errors or defects which do
not affect the substantial rights of the parties, and render such
judgment on the record as the law demands." Section 14010,
Code of 1924. We are of the opinion that the court committed
no reversible error in the admission of the photograph.

VII. On cross-examination, the defendant was interrogated
in regard to his testimony on the preliminary examination of
Elmer. It is objected that he could not be compelled in this way

6. CRIMINAL LAW:
evidence: evi-
dence at pre-
liminary exam-
ination.

to testify against himself, under the rule of
*State v. Meyer*, 181 Iowa 440. In that case the
defendant was suspected, subpoenaed, and ex-
amined. In the present case, there is evidence
that Elmer had accused defendant, but the evidence also shows
that defendant had first called the sheriff and the coroner, or
caused them to be called; that he was at the inquest; that the
sheriff the next day messaged the defendant to go to Decorah
and take others who were wanted as witnesses (evidently against
Elmer), and he did so. Mr. Allen, one of his attorneys, had been
previously employed in the case, though defendant says that he
himself had not employed him. Defendant would not say wheth-
er Mr. Allen was present at Elmer's preliminary examination.
There was no evidence that defendant was subpoenaed or com-
pelled to give evidence, or that he understood that he was under
any compulsion to do so, or that he made any objection to testi-
fying, or that his testimony on Elmer's hearing was not in all
respects voluntary. There was no error in the reception of this
evidence. *State v. Williams*, 197 Iowa 813; *Raffel v. United
States*, 271 U. S. 494 (70 L. Ed. 1054).

VIII. Defendant argues that there is no evidence of delib-
eration or premeditation.

Defendant had a deadly weapon. For the purpose of this

question, we must assume that he discharged it into the breast
of each victim.  Premeditation and deliberation need not exist
for any particular length of time before the kill-
ing, and may be proved by circumstantial evi-
dence.  The question was for the jury, and not
for the court.  *State v. Baker*, 143 Iowa 224, 229; *State v. Whit-
beck*, 145 Iowa 29, 37; *People v. Clark*, 7 N. Y. 385, 393; and
cases cited in 30 Corpus Juris 293.

7. HOMICIDE:
murder: pre-
meditation and
deliberation.

IX.  On the first trial, the jury determined that the pun-
ishment should be life imprisonment.  Defendant argues that
there are two grades of murder in the first degree; that the first
verdict acquitted defendant of the grade for
which the death penalty might be inflicted; and
that it was, therefore, error to authorize the
jury in the second trial to prescribe the death
penalty.

8. HOMICIDE:
murder: sentence
and punishment:
duty of jury to
determine.

Murder in the first degree "shall be punished with death,
or imprisonment for life at hard labor in the penitentiary as
determined by the jury * * *"  Code of 1897, Section 4728.
Murder in the second degree may be punished by life im-
prisonment.  Section 4729.

"Upon the trial of an indictment for murder, the jury, if
it finds the defendant guilty, must inquire, and by its verdict
ascertain and determine the degree * * *"  Section 4730.

"* * * the jury, if it finds the defendant guilty of murder
in the first degree, must direct in its verdict whether the pun-
ishment shall be death or imprisonment for life * * *"  Section
4731.

The degree does not determine the punishment, nor does the
punishment determine the degree.  Determination of the sen-
tence follows, and is (on this question) independent of, the
determination of the degree of the crime.  The court passes
sentence in accordance with the jury's determination, if the
verdict is allowed to stand, but the sentence and judgment is
the sentence and judgment of the court, pronounced for the
crime, and as a result of the verdict.  In this case, the defend-
ant asked that the former verdict be set aside, and it was set
aside.  The court on a second trial would not be precluded from
imposing a more severe penalty than on the first.  We perceive no
reason why the court should not have permitted the jury, as

it did on the second trial, to direct the infliction of the death penalty, if the jury found the defendant guilty of murder in the first degree. See *Murphy v. Massachusetts,* 177 U. S. 155; *Bryant v. United States,* 130 C. C. A. 491 (214 Fed. 51); *State v. Gunter,* 11 Ala. App. 399 (66 So. 844).

X. A juror testified on his *voir dire* that he had no opinion, had not discussed the case, and no one had discussed it in

9. CRIMINAL LAW: new trial: misconduct of juror: unsatisfactory showing.

his presence; that he never heard anyone express an opinion, and knew nothing that would influence his verdict except what he heard on the trial. On the motion for new trial, one affidavit set out that the juror, on the opening day, said that he knew all about the case, and knew that defendant was guilty. Another stated that the juror had said that he knew about the case, had read about it and talked about it; and that the juror then expressed an opinion. Another one stated that the juror said that defendant was guilty, and he knew he was guilty. Another affiant said that the juror said that he thought he was guilty. The juror denied making these or any similar statements. He said that since the trial he had frequently talked about the case and made statements to the effect that defendant was guilty. The juror also stated that he frequently talked about a case in Chickasaw County, tried several years before, and had talked to some of these affiants about that case, and that evidently they had confused the two cases. The juror deposed that he had not formed or expressed an opinion when he was drawn, and that he went on the case with a free and open mind, decided it according to the evidence, and took nothing else into consideration. One of the defendant's affiants filed an explanatory affidavit, to the effect that he understood the juror to be referring to the Kneeskern case, but might have misunderstood him. Numerous affidavits were filed to the effect that, prior to the trial, and at juror's shop, where one of the statements, at least, was claimed to have been made, the Kneeskern case was frequently mentioned, and that the juror would walk away, and avoid any conversation; and that, after the trial, the juror said that defendant was guilty; that, previous to the trial, the Chickasaw County case was frequently talked about; that some of defendant's affiants, before the trial, seemed to be endeavoring to create a favorable impression for defendant. The trial

court was of the opinion that there was nothing in the conduct of any of the jurors in any way prejudicial to the legal rights of the defendant. As said in *State v. Becker,* 159 Iowa 72, 76, the issue was primarily for the district court. We are of the opinion that cause for reversal for not setting aside the verdict for the alleged incompetency of the juror referred to is not shown. *Idem; State v. Reynolds,* 201 Iowa 10; *State v. James,* 198 Iowa 976.

XI. Two jurors made affidavits to references in the jury room to Irene's being pregnant, and to statements that defendant had taken three lives. The affiants made second affidavits that such statements in the jury room were not asserted as facts, or even as a positive opinion; that they were casual, and had no effect. Other jurors deposed that they heard no such statements. Error in denying new trial for this alleged misconduct is not shown. *Idem.*

10. CRIMINAL LAW: new trial: inconsequential remarks in jury room.

XII. Defendant alleges misconduct of the attorneys for the prosecution in their opening statements, in side remarks and improper comments on the evidence during its introduction, and in the closing arguments, in making references to Irene's beauty and to the conduct of the defendant and his witnesses and to the sheriff. He also contends that the audience was prejudiced, and manifested in various ways sympathy for the prosecution and hostility to the defendant, and that the court, in his rulings and in the conduct of the trial, was repressive in his attitude toward the defense, and exhibited partisanship in favor of the prosecution.

The case was one of tremendous importance to the defendant. His life was at stake. It was also of the greatest importance to the State. Two murders, and perhaps another crime of great magnitude, had been committed. The inquiry was a fascinating one. Able arrays of counsel, wrought up to the highest pitch of intensity and alertness, were contesting every inch of the way. Both sides, not unnaturally, were disputatious and combative. The court room, as was to be expected, was crowded to its extreme capacity. The trial was dramatic. It is too much to expect that human emotions, under such circumstances, would not be stirred, or could be wholly suppressed. The public had the right to be present. The trial was conducted at a considerable distance from the place of the crime, removed

from local prejudice. It occupied three weeks' time. The defendant and his counsel were naturally and necessarily disappointed in many contested rulings. The court was at all times alert to warn against any exhibition of partisanship, and to demand order and repress misconduct. The jury was properly admonished. We are of the opinion that defendant's complaint of misconduct and improprieties in the trial is not sustained.

XIII. The court entered an order excluding witnesses. From time to time, as offers of testimony implicating Elmer were made, Elmer was permitted to be present. It was within the discretion of the court to determine whether, and to what extent, witnesses should be excluded, and it was especially proper in this case to admit Elmer, under the circumstances related.

XIV. Defendant complains of the instructions. He says that they do not define premeditation and deliberation, or explain that they must be proved beyond reasonable doubt with the 11. CRIMINAL LAW: same conclusiveness and certainty as other ele-instructions: circumstantial ments of the crime. The court did define the evidence. words "deliberate" and "premeditate," as well as the other terms of definition of the crime charged and included crimes. He instructed very fully upon the law of reasonable doubt. The court instructed that, where the prosecution relies upon circumstantial evidence, the jury must be satisfied beyond a reasonable doubt that a crime has been committed, and the State must further prove to the satisfaction of the jury, beyond a reasonable doubt, not only that the circumstances proven are consistent with the commission of the act by defendant, but also that the facts are such as to be inconsistent with any other rational conclusion than that the defendant is the guilty person; and that, if there is one essential fact inconsistent with defendant's guilt, such fact is sufficient to raise a reasonable doubt, and the verdict should be "not guilty." No request for more explicit instructions was made; hence, objections that they were not sufficiently full or specific cannot be considered here. *State v. Fortune*, 196 Iowa 884; *State v. Poder*, 154 Iowa 686; *State v. Lynch*, 195 Iowa 560.

But we are of the opinion further that the case is not within the rule invoked by defendant, illustrated in *State v. Harmann*, 135 Iowa 167; *State v. Blydenburg*, 135 Iowa 264; *State v. Clark*, 145 Iowa 731. Under the rule of those cases, where guilt

depends upon proof of a chain of circumstances, and there is reasonable doubt as to the existence of a fact constituting a necessary link in the chain, the defendant cannot be convicted, and the court should so charge. The case before us is not one of establishing the murder and defendant's commission of it by "a chain of circumstances." The defendant admittedly was in the cabin alone with Irene shortly before the shooting. He had there a gun loaded with shells of a size which could have contained the charge found in her body. On the theory on which the case was tried, it was he who fired the fatal shot, unless he left within the few minutes before her death. If Elmer's testimony was true, he did not leave. He was not seen to leave, and no one but him was seen in the cabin after George Moore and Bobbie left. There was evidence of a number of circumstances, each independent of the other, leading to the conclusion that defendant did not leave; that he remained in the cabin; that he must have fired the shot that killed Irene. Any one of these circumstances might not be established, and still the proof of other circumstances might be sufficient to require a conviction. The case was not one of the breaking of a link in a chain. The instruction is not open to the criticism lodged against it. *State v. Lucas*, 122 Iowa 141; 16 Corpus Juris 766.

XV. Nor can defendant's complaint of the instructions relating to the purpose of the introduction of evidence of reputation and of contradictory statements in former testimony be sustained. The instructions were to the effect that such evidence was introduced only for the purpose of affecting the credibility of the witness, on the theory that a person of bad moral character or reputation for truth and veracity is less likely to speak the truth than one of good reputation, and that contradictory statements in previous testimony could not be considered as substantive evidence, but only as an aid in determining the weight of his testimony. There was such impeaching evidence of witnesses on both sides, including that of the defendant. If it were proper for the court to single out Elmer in particular in connection with this instruction, and omit reference to the defendant or to the other impeached witnesses, and defendant desired its specific application to Elmer, he should have made a request to that effect. There was no error in this respect.

12. CRIMINAL LAW: instructions: correct but inexplicit.

XVI. Instruction 21 told the jury that they had no right to disregard defendant's testimony on the ground alone that he stood charged with the crime; that the law allowed him to testify; and that his testimony should be impartially considered, together with all the evidence; "and if from all of the evidence you have a reasonable doubt * * *," he should be acquitted. In argument it is said that this instruction omits the element of lack or insufficiency of evidence. We are of the opinion that, in connection with the other instructions, it is not open to this criticism. This instruction had specific reference to the consideration to which defendant's testimony was entitled. Other instructions set out the rule of reasonable doubt, and correctly.

XVII. Instruction No. 35 is said to be erroneous, as an argument for conviction. We think it is not subject to such objection. The court told the jury that it was their duty to 13. CRIMINAL LAW: give the case their most careful attention, and instructions: to discharge their duty without hesitation, fear, summing up as to juror's duty. or favor, regardless of consequences; that the good of society required that crime should be surely and promptly punished; and that no consideration of sympathy or of excessive kindness should swerve the jury from their duty; that, on the other hand, they must not be influenced by any remarks of counsel or between counsel, nor by any feeling of excitement or prejudice in the community; and that the vast importance to society and to defendant of the result should prompt them to a careful and impartial investigation, looking only to the evidence, and actuated only by the motive of doing entire justice, under the evidence and the law.

XVIII. The defendant assigns 287 errors. We have discussed all that seem to merit particular consideration. The case was tried below, and is presented here with great thoroughness. Defendant has been twice found guilty. On the record before us, we are constrained to hold that he had a fair trial; that the evidence fully warrants the verdict; that the judgment is right; and that it should be affirmed. Judgment—*Affirmed*.

DE GRAFF, C. J., and EVANS, STEVENS, and VERMILION, JJ., concur.

FAVILLE and ALBERT, JJ., dissent.

FAVILLE and ALBERT, JJ. (dissenting).—We have carefully read the record in this case, including much testimony which is not set out in the majority opinion, and we are constrained to dissent from the holding of the majority.

The case turns largely, if not wholly, upon circumstantial evidence; but it is our opinion that the State fails· to produce sufficient evidence to carry the case to the jury; on well-known rules governing cases of this character, where the State relies upon circumstantial evidence, as the evidence submitted by the State does not exclude every other hypothesis except that of the defendant's guilt.