STATE OF IOWA, Appellee, v. JOHN MITCHEM, Appellant.

No. 41388.

November 14, 1933.

Charles P. Howard, for appellant.

Edward L. O'Connor, Attorney-general, and Walter F. Maley, Assistant Attorney-general, for appellee.

Mitchell, J.—Although this is a case in which the appellant is charged with murder, the argument presented to this court on behalf of the appellant consists of about one and a half pages, and the only question which is raised and argued is the question of whether or not there was sufficient evidence submitted to warrant a verdict of murder in the first degree. Thus we must look to the record to ascertain the facts as presented.

John Mitchem and his wife, Hattie Mitchem, formerly lived at 1058 West Twelfth street in the city of Des Moines, Iowa. They were married in 1929. In August of 1931 the wife, Hattie Mitchem, obtained a divorce from John Mitchem, and a restraining order was issued against him from returning to the home. According to the appellant, there were negotiations in progress between the appellant and his ex-wife to secure a possible reunion between the couple, and on the day of the homicide he had an agreement to meet her at her home about 2 o'clock in the afternoon to talk over this matter. Mitchem arrived ahead of his wife, and waited for her in the kitchen at 1058 West Twelfth street. They sat in the kitchen and talked, apparently peaceably for some time, about the matter of their reconciliation and the changing of beneficiaries in insurance policies that Mitchem had in the neigborhood of $3,200, all payable to Hattie Mitchem, and that and the reconciliation took up the bulk of the time and conversation. Mitchem claimed that at the time he was suffering from hay fever and was taking medicine for that purpose. He went to the door to spit, and at the time he had his back to Mrs. Mitchem, while spitting out of the door, a shot went off close to his head, and Mrs. Mitchem gave him a shove and told him to get out of her house.

The state offered several witnesses, all of whom in the record appeared to be disinterested parties.

Fred Morrow testified as follows: "I was sitting on my porch when I first heard the noise of a gun and finally the scream of a woman. She called, 'Mr. Morrow.' I ran around where they were. I saw Mitchem with a pistol in his hand. I told him, 'don't do that,' he was beating her with the pistol. He told me to go back. He got up off her and aimed the pistol down on her and shot her. Turned and walked away, went down to the corner, walked down Twelfth and Day. I was out in the yard pretty close to her when he fired the shot."

The state also offered a witness by the name of Beatrice Brown, who testified as follows: "When I ran across I saw Mr. Mitchem sitting on Mrs. Mitchem and he was fooling with a gun. He said, 'I am going to kill you,' and he shot her and walked away. I did not see him strike her. I don't know what kind of a looking gun it was."

The state also offered a witness by the name of Bessie Greene, who testified as follows: "I saw Mrs. Mitchem right on the ground and Mr. Mitchem standing there. I went around between the two houses. I saw Mr. Mitchem standing there pointing the gun toward her and the gun did not go off. I saw him stand there and fix the gun and shoot her. He shot toward her head. I have never seen Mrs. Mitchem move at no time. I was standing at the corner of the porch when the trouble started."

Dr. Russell A. Knight, testifying for the state, testified that on the evening of September 7th he made an examination of Hattie Mitchem and that she was dead at the time; that there was a bullet wound in the right temple just in front of her ear and slightly above, and the wound was bleeding freely; that she had been dead a very short time.

Appellant testified in his own behalf, and, after testifying in regard to various conversations he had had with Mrs. Mitchem prior to September 7, 1931, relative to a reconciliation between the two, testified as follows as to what happened on the afternoon of September 7th:

"So I went over there and she was not at home. Miss Nancy Williams was a very close friend of hers and I thought perhaps she would be over there, so I went over to Nancy Williams house, and

she says she has not been there, so I went back to her house and went in the back kitchen door and went through the kitchen into the dining room and waited until she came, and I wasn't any more in there than about ten minutes before she came in, and she says, 'Oh,' she says, 'I see you are here,' and I says, 'Yes,' I says, 'Well, how about us uniting again?' 'Well,' she says, 'It is a little early now, just wait a while.' And I says, 'What objections do you have of taking me back?' She says, 'John, you are a good man every way; you are a good provider; you bring your money home, and everything like that, but,' she says, 'But you nag too much, and you and I can't get along.' 'Well,' I says, 'I will guarantee you if I come back this time I will let you run your house to suit yourself, and I won't have anything to say.' She says, 'Well, I will see about that.' 'Well,' I says, 'Now don't make it too long,' I said, 'because I want to know how about changing my policies.' I had $3,200.00 at the Register and Tribune—$2,000.00 at the Register and Tribune that was insurance money, and there was another thing that we had to take out the option, $2,000.00 insurance and the option and that calls for $800.00, besides the Metropolitan Insurance. 'Now,' I says, 'I have to have these changed, and it will be a whole lot of trouble to my employers to have these changed and I want to get together on an understanding about it before I see them.' And I was suffering pretty bad then with hayfever and I was taking medicine for that purpose. So I went to the door to spit, and when I went to the door to spit, why, a shot went close to my head. I don't know which way it went, whether it went up or down or what, and when the shot went by she said, 'Get out of my house!' and give me a shove, and I put one foot out the door, and I says, 'Go ahead, you are trying to kill me.' And she shoved me back to the door and raised up the gun in one hand and held the other hand up like this (indicating) and she was much heavier than I was, and she shoved me out the door, and so we went to a distance of 36 feet. The reason why I know or say 36 feet is because I am familiar with box car lengths, I worked 18 years in the freight house—and we went 36 feet, about from here to where those men are standing by that light, and we went that far; we went out of the kitchen, out of the kitchen door; which faces west; the kitchen door faces directly west, and we went out of the kitchen door and off to the side which faces north, still I hadn't got possession of the gun. We had been in a standing position going back and forth; she was trying to bend down,

she was trying to bend down and I was trying to raise up; she would try to bend down like that (indicating); and when we got back a distance there was some rocks there and she fell over those rocks, and when she fell over those rocks I fell on top of her with my arms out like that (indicating) and trying to get the gun, and still she never had hollered yet. She never has hollered yet, and I got my hand on the gun, and she seen I had the gun and it was about to come into my possession and that is when she hollered.

"Q. What did she say? A. She just screamed, 'Oh! Oh!' and I got the gun and I says, 'I am not going to hurt you' and I got up to get up off of her, and I was straddle of her then, and I released my hand and got up on the opposite side with the gun, which is her gun, and in getting up this gun fired and broke, and you can examine it, anybody can on the table, when I got up to get on the other side I had the gun grasped in the middle, not by the handle. When I raised up to get up on the lefthand side of her she was laying with her face west; and I crossed over and across Day, and when I did cross that I had the gun in my hand, I never even turned to look. I walked down the hill and never looked back. I didn't go around the house at all, I went down the driveway. My clothes that I had on, my shirt where she grabbed it was tore, and I put my shirt down in my trousers as I was going down the hill, and when I got down the hill I turned south on 12th Street until I got to Day, and when I got to Day I turned east on Day Street and walked every bit of the way, I didn't run, and I walked over across, that is over to Mrs. Woods residence 1058—I walked over to Mrs. Woods residence, and the people begin coming and following me, and I still had the gun, and I walked in there and I put the little gun I think on my trunk, or either on the center table, I don't know where I laid it, and I opened my trunk and got my gun out because the crowd was getting thicker, and I wasn't fixing to let anybody take me but the law. When the law come I surrendered. I got my gun out because I knew it was a better gun than I had."

Thus it appears from an examination of the testimony offered that there was a conflict in the testimony in regard to what took place on the afternoon of September 7th at Hattie Mitchem's home. It was clearly a question for the jury. The jury listened to the evidence, and upon the evidence returned a verdict of guilty of murder in the first degree. No one reading this record can come to any

other conclusion but that there was sufficient evidence for the jury to so find.

Although the question as to the instructions is not raised in this record, as this is a murder case the court has given careful consideration and study to the instructions which the lower court gave to the jury. The lower court submitted to the jury the question of whether it was murder in the first degree, second degree, or manslaughter. There was no error in the submission of the instructions. From the whole record and the instructions which the court gave to the jury, the rights of the appellant were properly protected, and we come to the conclusion that the appellant had a fair trial and that the judgment of the lower court must be, and it is hereby, affirmed.

ALBERT, C. J., and EVANS, KINDIG, STEVENS, ANDERSON, and KINTZINGER, JJ., concur.