STATE OF IOWA, Appellee, v. FRANCIS WOOLMAN, Appellant.

No. 42447.

JUNE 23, 1934.

OPINION MODIFIED AND REHEARING DENIED NOVEMBER 20, 1934.

Daniel J. Gallery, for appellant.

Edward L. O'Connor and Walter F. Maley, and Charles D. VanWerden, for appellee.

EVANS, J.—The defendant is the head of a family and was thirty years of age at the time of the event hereinafter considered. He lived upon a farm. His nearest neighbor was the prosecuting witness, Estell. The contiguity of these two neighbors was a very unfortunate one. The farms joined. The house and buildings on the farm of Estell were within twenty feet of the partition line between the two farms. The house and buildings of Woolman were farther, but not far enough. The chickens of Estell became free commoners upon the farm of Woolman. Woolman was not as gracious about it as a better neighbor could have been. The feeling between the two had become bad and had resulted in harsh language on the part of both. The defendant had conceived the idea that he was legally permitted to shoot the chickens of his neighbor if they became trespassers upon him. On Sunday, September 17, 1933, Joe Rowe spent the day with the defendant. He had come the night before and had stayed all night. He was the owner of two guns and he brought them both along. This was not done pursuant to any prearranged plan in contemplation of the events that followed. The farm upon which the defendant lived was of very rough topography. It had many little hills with deep gullies between them. This topography was adapted principally to the use of the ground as a pasture. About 3 or 4 o'clock in the afternoon, the defendant and Rowe went out into the fields, each carrying a gun. They expected to bring home the cattle from a distant pasture after shooting a few expected *squirrels*. Such is this part of the story. What they did shoot was a couple of white chickens. These belonged to Estell. They were being diligently watched from the other farm. Estell came over the fence to look for the chickens, which he believed had been shot. He met the defendant and hard words ensued between them. The defendant ordered him off the place. Estell went, but returned almost immediately from another

direction. According to the evidence for the state, Estell and the defendant came again within speaking distance and about 250 feet apart. This is the point of time to which the charge of assault with intent is directed. The claim of the state is that at this time the defendant drew his loaded gun upon Estell and discharged it. It is the contention of the defendant that at no time did he draw his gun upon the defendant; that he had not yet discovered that Estell had returned to the premises. The evidence for the state shows that for a part of the time at least, Estell was screened from the view of the defendant by the foliage of an "elm tree". The contention of the defendant is that before he had even seen Estell he had drawn his gun and shot another chicken that was within 100 or 150 feet from him and which was not in the direction of Estell. The question which concerns us most deeply on this appeal is whether the evidence on behalf of the state has sufficient substance to warrant a verdict of guilty beyond a reasonable doubt.

The following is the testimony of Estell, the prosecuting witness:

"Q. And you could see Mr. Woolman? There was nothing in your view there? A. Not right where I stood, there wasn't.

"Q. What did Mr. Woolman do, if anything, at that time, Mr. Estell? A. He throwed his shot gun up to his shoulder. I jumped over and tried to get behind this tree.

"Q. Is this the tree that you had told about being in the west side of the north-and-south ditch that is a little south of the main ditch? A. Yes, sir.

"Q. And did you see him do anything else? A. No. When I jumped over there the limbs hung down on this tree, and it screened him from my view.

"Q. What, if anything else, happened right there? A. There was a shot fired, and there was shot fanned around by me.

"Q. Did you hear this shot? A. I did.

"Q. Did any of it strike you? A. No, it did not.

"Q. Describe what you heard there? A. Well, it just sounded like there was shot on all sides of me. It sounded like it went through the brush, or something."

On cross-examination he testified as follows:

"Q. And now, as I understand you, you did not see Mr. Woolman shoot the gun? A. No, I did not see Mr. Woolman shoot the gun."

Mrs. Estell testified for the state as follows:

"Q. Did Percy say anything to him? A. No, Percy didn't say anything at that time. And he said, 'You damned son-of-a-bitch, I'll fill you so full of lead you can't get back,' and he ran a few steps down towards Percy, and he stopped, and he put his gun to his shoulder, and deliberately aimed at him, and fired.

"Q. And you saw him shoot this gun? A. I did.

"Q. And you saw him aim at Mr. Estell? A. I did.

"Q. What did Mr. Estell do at that time or just prior to the time that this gun was fired? Did you see him? A. I don't believe I did. I was watching Woolman.

"Q. Well now, what, if anything, happened just after this shot was fired? What did Mr. Estell do? A. Well, he was down by that elm tree, and I could not say whether he was still going north or not, but after Woolman fired, he started in a southwest direction back towards the fence.

"Q. Did you yell anything to him? A. I didn't for a few minutes. I seen Woolman run west with his gun to his shoulder.

"Woolman ran around with his gun to his shoulder looking up through the trees up towards where Percy was. I yelled at Mr. Estell. I don't know whether I can state my exact words or not to him. Well, Mr. Woolman went out of sight, and then he came back in sight. Just when I yelled at Percy is when he came back in sight. He still had his gun at his shoulder. He had it pointed in a southwest direction. Well, it was pointed towards Mr. Estell. He did not shoot at him again. He went on up towards the house."

On cross-examination Mrs. Estell testified as follows:

"Q. Now, at that point, Mrs. Estell, it wasn't possible for you to tell whether Mr. Woolman was pointing that gun at your husband, was it? A. It certainly looked like he was.

"Q. You were merely looking in sidewise at the barrel of the gun, weren't you? A. I wasn't in direct line with them. I was up to the south—south of Mr. Estell—south of both of them.

"Q. Did you see any smoke from the gun? A. It seems to me like I did. I can't remember for sure. I wouldn't say for sure. It just seems like I saw smoke, but I can't say positive whether I did or not."

The foregoing is all the testimony offered by the state on the subject of the shooting. Audrey Estell was a very active partici-

pant in the quarrel. He was the son of Estell and under 21 years of age. He was present at the time of the alleged shooting. He was not called as a witness. To our minds the evidence on its face is very unsatisfactory. There are two affirmative features of the case that render it still more so. Reference has been made in the record to an "elm tree" behind which Estell was screened at the time of the shooting. Estell testified, as above indicated, that he heard the sound of the shot about him. That would tend to show that the carrying capacity of the gun was sufficient to reach the target. In order to show that the carrying capacity of the gun was not only sufficient to reach the target, but sufficient to reach it with great and destructive force, the state caused certain experiments to be made and introduced proofs thereof. Their witnesses set up a target of beaver board in the near vicinity of the place of these events. They took the particular gun used by the defendant and loaded it with the same kind of shell. It was a 12-gauge gun, No. 6 shell. At a point 250 feet distant from the target (which was the distance fixed by the evidence of the state), they discharged the gun into the beaver board target. Sixty-six bullets penetrated the beaver board. This evidence not only proved the carrying capacity of the gun, but it became also evidence quite incontrovertible under the "physical fact" rule that if the discharge of the defendant had been directed towards Estell behind the foliage it would have left its wounds upon the tree. There is no claim by the state that any twig upon the tree carried any wound whatever. This is very strong evidence that the gun could not have been directed toward the tree at the time of its discharge. The "physical fact" thus disclosed is established by the evidence of the state itself.

We reach the conclusion that the motion of the defendant for a directed verdict at the close of all the evidence should have been sustained. The judgment below will accordingly be reversed and remanded, with directions to sustain the motion.—Reversed and remanded.

CLAUSSEN, C. J., and ALBERT, KINTZINGER, ANDERSON, DONEGAN, and MITCHELL, JJ., concur.