State of Iowa, Appellee, v. George Miller, Appellant.

No. 45687.

FEBRUARY 17, 1942.

Yeaman & Yeaman, for appellant.

John M. Rankin, Attorney General, Jens Grothe, Assistant Attorney General, Louis Corcoran, County Attorney of Osceola County, and Earl Fisher, County Attorney of Lyon County, for appellee.

SAGER, J.—At about 10 o'clock on the evening of May 16, 1940, appellant was seated at the south end of the Corner Cafe in the town of Doon. While there, the prosecuting witness, Kersbergen, and Bernard Mann, hereinafter referred to as Red, came in and took seats in booths arranged along one side of the restaurant. Shortly after the arrival of Kersbergen and Red, appellant walked to the bar opposite the booths in which the former were seated, and bought a glass of beer. Appellant and the others had been friends for 25 years or more. Notwithstanding this, it is the claim of Red and of the prosecuting witness that without any provocation, and, to use the expression of one, "out of a clear sky," appellant called them a vile name, whereupon both of them jumped up. Red reached appellant first and gave orders to Kersbergen to stay out of it.

Red grabbed appellant by the neck and slapped him with such force as to knock him over into a booth. Whether Red helped him up or dragged him out is not clear but he led appellant to the door, meanwhile striking him in the face with his fist once or twice. The last blow was struck in the cafe

865

as they reached the door and appellant stumbled or fell out onto the steps or to the sidewalk. Red estimates the number of times that he struck appellant was the slap with the open hand and four times with a clenched fist. Appellant made no effort to defend himself or to strike back. Getting on his feet he started to run to the northeast across the street toward the Bauer home. For convenience of reference a photostatic copy of a plat used in evidence, Exhibit 3, is here inserted. Red started in pursuit with Kersbergen close behind. Whether the appellant was knocked down in the street before he reached the Bauer building or stumbled is not clear. Red testified that he (appellant) stumbled just as he grabbed appellant. All of the witnesses for the prosecution who testified on the subject say that appellant was lying on the ground in the street begging that he not be hit any more.

Getting to his feet, with or without assistance, appellant, in the grasp of Red, was then led back to the Corner Cafe for the purpose or on the pretext of getting his cap. Red thus refers to appellant's condition at that time:

"A. Well, I thought his face was all bloody and his clothes was bloody, and I thought I had to wash him off so he would look a little respectable. Q. The blood had trickled down to his coat and shirt and trousers? A. I don't know about his trousers. His neck was all blood."

Red's professed desire to wash up appellant could well have been carried out at the Corner Cafe where appellant had been at the beginning. Instead he took appellant west across the street and down to what is marked on the plat, Cosmo Cafe, keeping hold of him all the time, parading him down the street so that his bruised and battered condition might be seen by the crowd.

When they reached the Cosmo Cafe appellant expressed himself as not wanting to go in whereupon Red proposed that he take him to the fountain located at the northwest corner of the intersection near the building marked Farmers Hardware on the plat. To accomplish this appellant was

walked in the gutter while Red kept to the sidewalk. Coming to the southwest corner of the intersection Red started to lead appellant diagonally across the intersection. When they got part way across appellant broke away from Red and started back to the south in the direction of his car which was parked near the place marked on the plat as the "back door" of the Corner Cafe. At this point Red seemingly having concluded that appellant had been maltreated enough, expressed the purpose of letting him go.

But at this point the prosecuting witness, Kersbergen, who had followed close behind appellant and Red throughout, took a hand. He had been ready to assault appellant in the beginning and would have done so except that he was ordered by Red to keep out.

Before continuing with the record dealing with the prosecuting witness' activities, it will be of interest to note Red's attitude. After testifying to the vile name he alleges appellant used towards Red and Kersbergen (though no one else in the cafe heard it), he then narrates in part his treatment of appellant:

"Q. You just got right up and slapped him, didn't you? A. That's right. Q. How hard did you slap him? A. Pretty hard. Q. Just about as hard as you could? A. Yes, sir. Q. Which hand was it? A. Right hand. Q. Was it your open hand? A. Yes, sir. * * * Q. You didn't temper that blow one bit because you had known him for twenty years, did you? A. Well, I wouldn't say so; no. Q. You didn't have a bit of mercy on him? You just slapped him just as hard as you could? A. I probably did. Q. And what happened to him when you landed this 'hay maker' on him? A. He slipped and fell in the booth. Q. Slipped toward you, then? A. Slipped in the booth behind me. Q. He was over here at the counter, wasn't he, at the bar, on the east side? A. Yes, sir. Q. How did he get over here into the booth, then? A. I don't know how he got over there. I know he was in there. Q. After you got through hitting him? A. Slapped him the first time; yes. Q. And he went right down on the table, didn't he? A. Well, partially: yes.

* * * Q. But he didn't get quite down to the floor? A. No, sir. Q. So you got hold of him? Whereabouts? A. By the collar. Q. And you grabbed him by the collar with your right hand or left hand? A. Left hand. Q. And you kept your right hand free to use again? A. That's right. I used it, too. Q. And about how many times did you use it, Mr. Mann? A. Well, I think I hit him three times. Slapped him once and hit him twice, in the cafe. Q. And what effect did this have on Mr. Miller as you hung on to his collar and slugged him with your right hand? A. He was still tough. Q. He was still tough. Did he say anything to you? A. I don't recall that he did. Q. He was quite silent about the slugging? A. No. He started to run outside. Q. Well, he didn't say anything to you, did he? A. I don't remember. * * * Q. And you got hold of his collar and hung right on to it as he was going out the door? A. That's right. Q. And you don't remember hitting him more than twice between there and the door? A. No. Q. Now, when you got him to the door did you slug him again, or did you give him a shove? A. We went outside together.''

After telling how appellant went down on the steps at the Corner Cafe the witness continued:

''Q. You knocked him down? A. After we got out on the sidewalk, yes. Q. You knocked him down. And where did he fall? A. On the sidewalk.''

After some further testimony not necessary to be set forth, Red continued:

''Q. And will you tell the jury what you did to Mr. Miller after you got him out on the sidewalk? A. I hit him a couple of times. Q. Where did you hit him? A. In the face. Q. What part of the face? A. I couldn't say. Q. You were hitting him so fast you didn't pay much attention to just where you hit him? A. No, it didn't make much. Q. You were pretty angry at him? A. Yes, sir. Q. And you didn't care if you did do some serious damage to him? A. No. Q. In fact, you were trying to do a good job on him? A. He asked for it. Q. What do you mean, 'he asked for it?' A. Well, he did. He called me a ———, so he was asking for it.''

Elaborating somewhat as to what happened at the door of the Corner Cafe, Red said:

"Q. What happened to Mr. Miller when you slugged him in the face on the sidewalk here? Did he go down? A. Part way; yes. Q. And staggered? A. Yes. Q. Did he go down on his knees? A. No. Q. How far down did he get? A. Just with his hands. Q. His hands touched the pavement? A. I think his hands touched the blocks of the steps. Q. His hands touched the blocks of the steps? A. Yes. Q. And did you help him up? A. No, he got up and he run. Q. And you right after him? A. Yes. Q. Did you get hold of his collar again? A. That's right. You bet I did." (This has reference to appellant's attempt to escape when he ran over towards the Bauer home.)

Red was asked: "Q. What was the reason that you followed him across there when he was trying to run away from you?" He answered: "I thought maybe he wasn't satisfied yet. I was still mad."

As indicating something more of the attitude of Red we quote the following from the transcript:

"Q. You did just about as thorough a job on Mr. Miller as anybody could do on another man and not kill him, isn't that a fact? A. I'll guess with you. Q. How was that? A. I'll guess with you. * * * (Question read by the Reporter: 'You did just about as thorough a job on Mr. Miller as anybody could do on another man and not kill him, isn't that a fact?') A. Well, he had more parts of his body left, I guess. Q. You think you missed some spots? A. A few."

It should be said that Red was a tractor operator, 36 years old, weighing 187 pounds; and Kersbergen a former garage operator, 53 years old, weighing 160 pounds. Appellant was past 60.

We return to the prosecuting witness' part in this affair. This witness as has been pointed out followed close behind Red during all the abuse to which appellant was subjected. When appellant finally escaped from Red and started for his car, the prosecuting witness took up the chase and followed him on the

run to the car. Appellant not being able to open the front door because of a button locking it on the inside, made a "dive" into the back of the car. The prosecuting witness followed and made what was described as a "flying tackle", getting appellant around the legs, and tried to drag him out. During this time appellant lay face downward and twice demanded that whoever it was that had a hold on him, let go; the third time he announced that unless his assailant let go, he would shoot; Kersbergen hung on and appellant did shoot, one ball hitting Kersbergen along the ear and the other breaking his arm. This completes the story as far as it needs to be told now except that Red was at hand and started for Miller just before the shooting began and proceeded to beat appellant further to a point where he was so disfigured as to be unrecognizable by his own doctor. Both the prosecuting witness and Red repeatedly expressed themselves as having at no time any fear of the appellant, but on the contrary rather boastfully acknowledged their ability to take care of themselves and of him.

During all the transactions we have narrated, and others which might be set out, appellant made no assault or attempted assault on anyone nor did he seek to defend himself, except in flight which proved of no avail, until, having escaped to his car and being partly in it, he shot through the door as has just been detailed. Even had he used the vile epithet about which Red and his fellow laborer testified, this was no justification for the assault. Citation of authority is scarcely needed to support this but see State v. Davis, 209 Iowa 524, 228 N. W. 37. We have purposely confined our discussion of the evidence to the testimony of the prosecuting witness and Red. Out of their own mouths they have made a clear case of self-defense for appellant; and we can imagine no case to which this language of Weaver, J., in State v. Borwick, 193 Iowa 639, 643, 187 N. W. 460, 462, would more aptly apply:

" * * * if he did use a deadly weapon (as we must assume he did) to repel his assailant, no just-minded man could draw therefrom an inference of the malice essential to a finding of guilt of murder. The undisputed facts sufficiently rebut the inference or presumption of malice which might otherwise arise from the mere use of a deadly weapon."

We do not overlook the arguments and citations of appellee but there are none among them which require a result different than that here announced. These are the cases cited as justifying the ruling on appellant's motion to direct: State v. Kneeskern, 203 Iowa 929, 210 N. W. 465; State v. Bingaman, 210 Iowa 160, 230 N. W. 394; State v. Mitchem, 217 Iowa 152, 251 N. W. 46; State v. Woolman, 218 Iowa 967, 255 N. W. 524, 257 N. W. 318; State v. Brewer, 218 Iowa 1287, 254 N. W. 834; State v. Griffin, 218 Iowa 1301, 254 N. W. 841; State v. Clay, 222 Iowa 1142, 271 N. W. 212. None approaches this case in its facts and we doubt very much whether a case like this can be found. We conclude that the court should have sustained appellant's motion to direct a verdict.

In order to make sense out of what has gone before, it should be stated that there are many features contained in the transcript that are not here set down. The testimony of the prosecuting witness and of Red does not square with ordinary experience, their abuse of appellant seeming to be without motive and without excuse. The fact is, if we have read the record correctly, that there had been some previous discussion of war matters wherein the president and Hitler were mentioned and the prosecuting witness and Red, with superheated patriotism, sought to demonstrate their loyalty by beating up appellant and parading him up and down the street, covered with blood, for the entertainment of bystanders.

The conclusion announced makes it unnecessary that we discuss the other assignments of error found in the briefs.

The judgment of the court below is accordingly reversed and the cause remanded with directions to sustain the motion. —Reversed and remanded with directions.

CHIEF JUSTICE and all JUSTICES concur.